CASTLEMAN et al. v. RAINEY et al.
(No. 8112.)

(Court of Civil Appeals of Texas. Dallas.
March 15, 1919. Rehearing Denied
May 17, 1919.)

1. INJUNCTION ⚙══114(3)—DEFENDANTS—LIVE
STOCK INSPECTOR—SANITARY COMMISSION AS
NECESSARY PARTY.

In suit to enjoin live stock inspectors acting without warrant of law in requiring the dipping of cattle to eradicate ticks, the live stock sanitary commission, under whom the inspectors acted, was not a necessary party to the suit.

2. INJUNCTION ⚙══114(2)—JOINDER OF PLAINTIFFS—INJUNCTION SUIT AGAINST CATTLE INSPECTORS.

In suit to enjoin live stock inspectors from requiring the dipping of cattle to eradicate fever ticks, several cattle owners had the right to join with each other in asking the relief sought, not seeking to recover a money judgment for injury alleged to have been inflicted.

3. INJUNCTION ⚙══114(3)—JOINDER OF PARTIES DEFENDANT — INJUNCTION SUIT AGAINST INSPECTORS.

In suit by cattle owners to enjoin live stock inspectors from requiring the dipping of cattle to eradicate fever ticks without statutory warrant, the several live stock inspectors were properly joined as defendants; the suit not being to recover damages, but to enjoin threatened acts.

4. INJUNCTION ⚙══118(1)—PLEADING—PETITION TO ENJOIN CATTLE DIPPING.

Petition against live stock inspectors to enjoin them from requiring dipping of cattle of several owners without statutory warrant, also plea of intervention filed by other cattle owners, which adopted the allegations of the petition, held sufficiently specific as to nature of acts sought to be prevented, the persons threatening the acts, and the injury or damage which would result.

5. INJUNCTION ⚙══118(4)—PETITION—IRREPARABLE INJURY—SUIT TO ENJOIN DIPPING OF CATTLE.

Petition of cattle owners to enjoin live stock inspectors from requiring the dipping of cattle to eradicate fever ticks without statutory warrant held not subject to special exception as not alleging facts showing that plaintiffs would suffer irreparable injury, alleging that plaintiffs' stock would be seriously crippled and bruised, while as to milch cows there would be a total or at least a partial loss of milk and butter.

6. ANIMALS ⚙══29 — TICK ERADICATION — COUNTY ELECTON—CURATIVE ACT.

In view of Const. art. 16, § 23, the Legislature had authority to validate, by Act May 12, 1917 (Acts 35th Leg. [1st Called Sess.] c. 4 [Vernon's Ann. Civ. St. Supp. 1918, arts. 7314r, 7314s]), an election of April 3, 1917, whereby Dallas county determined, under Acts 33d Leg. c. 169 (Vernon's Sayles' Ann. Civ. St. 1914, arts. 7314–7314e), that the county should take up the work of tick eradication, though

chapter 169 before the election was held was repealed by Acts 35th Leg. c. 60 (Vernon's Ann. Civ. St. Supp. 1918, arts. 7314–7314q).

7. INJUNCTION ⚙══74 — LIVE STOCK INSPECTORS—TICK ERADICATION.

Live stock inspectors though empowered by statute to take up the work of tick eradication may be enjoined at the suit of cattle owners from dipping sound cattle in liquids, chemicals, and poisons not conforming to that prescribed for treatment of splenetic fever or the eradication of fever carrying ticks.

8. INJUNCTION ⚙══128 — SUIT AGAINST LIVE STOCK INSPECTORS—EVIDENCE.

In suit to enjoin live stock inspectors from dipping plaintiffs' cattle for tick eradication without statutory warrant or improperly as without inspection and in injurious chemicals, evidence held sufficient to raise the issue that the mixture in which the inspectors threatened to dip the cattle was not properly proportioned or mixed and was not the official dip.

9. ANIMALS ⚙══29 — ERADICATION OF TICKS FROM CATTLE—INSPECTION.

To authorize official live stock inspectors to proceed with dipping of cattle under tick eradication laws, it is not necessary that each animal be inspected and some condition found to exist authorizing work of tick eradication, but before the Live Stock Commission or its agents or inspectors are authorized to require dipping or to dip the cattle themselves, some investigation must be made disclosing existence of disease or presence of tick.

10. INJUNCTION ⚙══192 — INJUNCTION AGAINST OFFICIALS—PRIOR RESIGNATION.

In suit to enjoin live stock inspectors acting under the Live Stock Commission from dipping cattle for tick eradication without statutory warrant, the court erred in rendering judgment perpetuating injunction and taxing costs against a defendant, who had resigned before institution of suit and another who resigned before trial.

Appeal from District Court, Dallas County; E. B. Muse, Judge.

Suit by Harmon Rainey and others against A. T. Castleman and others, wherein John Ferguson and others intervened as plaintiffs. From judgment for plaintiffs, defendants appeal. Affirmed in part, and reversed and rendered in part.

Liveley & Goggans, of Dallas. for appellants.

Chas. F. Greenwood, of Dallas, for appellees.

TALBOT, J.    Harmon Rainey and 49 others brought this suit against A. T. Castleman and 14 others, all citizens of Dallas county, Tex., to restrain defendants, who were inspectors in and for said county and acting under the live stock sanitary commission of this state, from requiring plaintiffs' cattle to be dipped for the eradication

⚙══For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

of fever carrying ticks. The original petition was filed June 19, 1917, and a temporary restraining order, in accordance with the allegations and prayer of that petition, was granted and the matter for further action set down for June 25, 1917. On the last-named date the plaintiff filed an amended petition, upon which the case was tried, alleging, in substance: That they owned and kept live stock upon their premises in said Dallas county, consisting of cattle, horses, and mules. That the defendants purport to be and are pretending to act as official live stock inspectors in and for Dallas county, and are being paid a salary as such pretended inspectors by the commissioners' court of said county; that defendants are claiming the right, power, and authority as inspectors to compel plaintiffs and all other citizens of Dallas county who own or have such live stock under their control to dip said live stock in certain vats constructed by defendants and the county authorities of Dallas county in June, 1917, and located at various points in said county, and that after the construction of the vats the defendants filled them with a mixture of fluids, chemicals, and poison, and began calling upon and demanding that plaintiffs and all other citizens owning or controlling live stock in Dallas county should immediately drive their stock to the vats and dip them into said mixture and poison, and threatened and stated that all who did not comply with said demand would be arrested, prosecuted, and fined for their failure or refusal so to do. That the vats are about 18 or 20 feet in length, and from 3 to 5 feet wide and constructed in excavations about 7 or 8 feet below the surface of the earth, with a narrow chute leading to one end of the vats, and through which chute the defendants compelled and are still attempting to compel plaintiffs and other citizens to drive their stock and cause them to jump or fall a distance of several feet into the vats with great force and violence. That on account of the character, quality, and quantity of the fluids, chemicals, and poisons placed and maintained in the vats by defendants, and the manner and means used in the construction of the vats and chutes, and the manner employed by defendants in forcibly compelling plaintiffs and other citizens to drive their live stock into the vats, great damage has already been inflicted on plaintiffs and other citizens, and that "unless the unauthorized and unlawful conduct of defendants is restrained by the court said defendants will continue to employ said means and methods in the future as they have in the past, and will continue in their demands to forcibly compel plaintiffs and other citizens to drive their stock into said vats, and that unless restrained the defendants will thus cause plaintiffs and said other citizens to suffer irreparable injury. That the dipping of said stock was without their consent and contrary to their wishes, and was caused by the demands, notifications, and threats of defendants. That the live stock so dipped were bruised, skinned, crippled, and injured, because of the manner of the construction of said vats and chutes, and on account of forcing the animals to jump or fall into same, and because of the quality and quantity of said liquid and poisons in the vats. That defendants so conducted said operations and work as to cause said live stock to swallow and inhale said poisons, causing them to be almost strangled to death, and rendering them weak, stiff, and sick, numerous cattle of plaintiffs and other citizens being thereby crippled and injured and some killed. That numerous and valuable milch cows were thereby crippled and killed. That many of said cows were so injured and poisoned they dried up in their milk from one-third to one-half of the quantity they had theretofore been giving, causing their bags and teats to be injured, in some instances causing the milk of the cows to be unnatural and bloodshot, wholly unfitting it for family use, also decreasing the amount of butter realized by plaintiffs in proportion to the decrease in the milk. That plaintiffs were depending upon their milch cows for all the milk and butter necessary for their families, and that the damage they have suffered in this particular is serious. That defendants not only brought about the dipping, but stated that they would accept no reason or excuse for a failure to comply with their demands.

It was further alleged that said live stock were healthy at the time of the forcible dipping, and did not have splenetic fever, and did not have any other malignant, contagious, infectious, or communicable disease whatever, and were not affected with any agency or condition for the transmission of splenetic fever, and did not have upon them any fever producing ticks, and had not been exposed to said conditions, all of which was well known to defendants, or could have been known to them had they used proper diligence; that before the defendants caused said dipping and injuries they had never inspected said stock, and had not found said live stock with splenetic fever or fever producing ticks, but nevertheless they insisted and persistently demanded that plaintiffs and other citizens should drive their live stock into said vats of liquids and poisons, and threatened that all who refused or failed to do so would be reported by them to the constable or sheriff, and that the defendants and said officers whould enter the premises of those who disobeyed, and then forcibly take and drive their live stock away from the control and possession of such owners, and then force such stock into said vats.

It was also alleged that defendants did not claim that said live stock had splenetic fever, or that they had made any inspection or had found fever producing ticks upon said cattle, but claimed and asserted that they had the power and authority to compel the dipping of all cattle, horses, and mules in Dallas county, even though said live stock were in a perfectly healthy condition. The petition further alleged that plaintiffs protested against the conduct of defendants, and requested them to inspect the live stock of plaintiffs before requiring them to be dipped, but that defendants arbitrarily refused to comply with such reasonable request, and failed and refused to examine or make any inspection whatever, but proceeded to carry out the forcible dipping of live stock, although not a condition existed in law or fact that warranted forcible dipping; that the stock of some of plaintiffs had been dipped once, and the stock of other plaintiffs had been dipped twice, and that defendants are demanding that all of said stock be dipped again and as often in the future as defendants shall demand, and at least every two weeks, and that defendants have threatened that they in connection with the sheriff or constable will forcibly dip the stock of all who refuse to comply with said demands, and that unless restrained by the court, the defendants will execute said threats, and will cause plaintiffs to be arrested and prosecuted in the courts, and that in carrying out said forcible dipping, they will cause the live stock of plaintiffs and others to be injured, poisoned, crippled, and killed, to the great damage of the owners.

The nature and extent of the injuries resulting to the stock of certain named plaintiffs on account of the forcible dipping is specifically alleged, and, further, that the defendants are now notifying plaintiffs and other citizens that all their horses, mules, and asses must be dipped in said vats in like manner with their cattle, although said live stock are not affected with any disease of any kind or character whatever; that defendants have made no inspection of said animals, and if the demands and threats of defendants are carried out, plaintiffs and each of them will suffer thousands of dollars damage on account of the fact that their horses, mules, and asses will be injured, crippled, poisoned, and damaged.

It is further alleged that the said trespasses and wrongs were without authority of law, and that any statute attempting to authorize such invasion of personal rights would violate the Constitution of the state; that an election was held in Dallas county with reference to "tick eradication" on April 3, 1917; that said election did not and could not put the act of the Thirty-Fifth Legislature (chapter 60 [Vernon's Ann. Civ. St. Supp. 1918, arts. 7314–7314p]), which became effective on March 6, 1917, in force in Dallas county; that said election held on April 3, 1917, was ordered on February 12, 1917, on certain petitions filed with the commissioners' court before and on the 12th day of February, 1917, while the act of the Legislature enacted in 1913 was in full force (Acts 33d Leg. c. 169 [Vernon's Sayles' Ann. Civ. St. 1914, arts. 7314–7314e]); that the election was ordered under said act of 1913, and for the express purpose of permitting the voters to determine whether or not they would approve and adopt the act of 1913 for Dallas county; that the petitions were granted by the commissioners' court, and the election called to determine whether the voters would adopt the act of 1913; that after the court ordered the election and between said date and the 3d of April, the Thirty-Fifth Legislature, then in session, enacted a new statute, expressly repealing the act of 1913, so that on the day of the election the very act the voters were to vote on had passed out of existence by an express repeal; that the act of 1913 having been expressly repealed on March 6, 1917, and the new act taking effect on that day, it therefore follows that the forcible dipping of live stock and the resultant injury was without authority of law, for the reason that the act submitted to the voters was already repealed, and the other act was not passed until weeks after the calling of the election, and was not involved in said election, and was not being submitted to the voters. It was also averred that the county judge and commissioners' court had failed to cause any official publication to be made of the result of said election held on April 3, 1917, in any newspaper published in Dallas county. It was alleged that defendants were demanding and insisting that plaintiffs and other citizens should submit their live stock to the dipping process again and at frequent intervals in the future, and threatening that if said demands are not complied with, all who refuse obedience will be arrested, prosecuted, and fined; that their premises will be invaded by defendants and the sheriff of Dallas county and their live stock forcibly dipped as theretofore. The petition concludes with a prayer for injunctive relief, and "such other and further relief in law and equity as they may show themselves entitled to." On June 25, 1917, a plea of intervention was filed and presented by John Ferguson and numerous other citizens as interveners. The interveners adopted the pleadings of plaintiffs as contained in plaintiffs' first amended original petition and first supplemental petition and replication of plaintiffs. Interveners alleged and set out in detail the damage they had sustained by reason of cattle killed, bruised, injured, and poisoned by the forcible dipping of their live stock in the vats at the hands of defendants.

The defendants on June 25, 1917, filed a plea in abatement and original answer. On the same day they filed an amended plea in abatement and an amended answer. By their plea in abatement they asserted that the suit should be abated and dismissed, because: First, the pleadings of the plaintiffs do not connect defendants with the legal authority given in the laws of the state of Texas for the dipping of cattle, horses, etc., for the purpose of tick eradication, in that it is not alleged by and under what authority defendants are purporting to act; second, said pleadings show on their face that defendants are only ministerial officers or the representatives of some authority not specified; third, said pleadings show that the acts of defendants complained of are in effect the acts of an officer of the state of Texas and its executive officers; fourth, the laws of this state providing for tick eradication create a live stock sanitary commission, and confer powers on said commission to enforce said laws and its regulations, and under the provisions of the law the inspectors are not charged with the enforcing of said laws; and, fifth, the defendants are not proper or necessary parties to this suit.

In their answer the defendants pleaded a general demurrer, numerous special demurrers, the general issue, and specially that they were not working in the capacity of "live stock inspectors" of Dallas county, Tex., under an order of the commissioners' court of said county, but were inspectors appointed by the live stock sanitary commission of Texas, and as such had endeavored to carry out the instructions and regulations of said commission, which it had established and promulgated with reference to the enforcement of the law commonly known as "Tick Eradication" in and for Dallas county, Tex., and for dipping said cattle in said county, and that they nor either of them were guilty of any wrongs complained of in plaintiffs' petition; they deny specifically the construction of the vats in Dallas county by them, and deny that they or either of them had handled in any way the cattle of the plaintiffs or any of the citizens in Dallas county, Tex., or that they had forced said cattle into vats or had anything to do with the construction of said vats, pens, chutes, etc. They specifically deny that they were acting together in the endeavor to enforce the said law, and allege that they and each of them had their own separate and distinct districts in which they mixed the fluids for the purpose of dipping cattle in the vats located in said districts, and were present on the dipping days for said vats to test said fluids and to see that they were properly mixed, and alleged that the people and citizens, including the plaintiffs in this case and interveners, dipped their own cattle in said vats, and that if there were any cruelties or injuries to said cattle it was the result of the acts of plaintiffs and their assistants in handling said cattle.

Defendants further alleged that all their acts as inspectors under and by virtue of their appointment by the live stock sanitary commission of the state of Texas were had and done under the authority given to the defendants and each of them by the live stock sanitary commission of the state of Texas, and its rules and regulations, and given in accordance with the provisions of the statute commonly known as "Tick Eradication Law," which was adopted by vote of the people of Dallas county on April 3, 1917, and further alleged that any irregularities that might have occurred in the voting of said law and election held as complained of in plaintiffs' petition had been validated by a special act of the Legislature known as the "Validating Act" (Acts 35th Leg. [1st Called Sess.] c. 4 [Vernon's Ann. Civ. St. Supp. 1918, arts. 7314r, 7314s]), by the terms of which the election held in Dallas county was in all things validated, and that by reason of said election and said validating act, and by reason of the proclamation of the Governor of the state of Texas and the rules and regulations passed by the live stock sanitary commission of the state of Texas, Dallas county was under quarantine, and that they were acting as duly appointed and acting representatives of the live stock sanitary commission of the state of Texas. They further allege that there was in Dallas county at the date of said proclamation by the governor, and at the date of the promulgation of said rules and regulations and the publication of said quarantine notice, splenetic fever, and there was also a prevalence of the fever bearing tick, and that the greatest interests of the citizenship of Dallas county, and particularly the stock raisers, demand enforcement of the law for the purpose of eradication of said tick and splenetic fever. They further alleged that the rules and regulations promulgated by the live stock sanitary commission of Texas and by the Governor of the state of Texas, as provided by law, require systematic dipping to eradicate the tick and prevent the fever; that Dallas county was under quarantine, and that they were acting in all things in accordance with the provisions of said law; that said plea and answer were duly verified.

The plaintiffs filed their first supplemental petition on June 25, in which they pleaded a general demurrer and special exceptions to the defendants' answer. They also pleaded a general denial of the allegations of defendants' answer, and alleged that the live stock sanitary commission and no other body of men had the legal right, power, or authority to instruct or to authorize said inspectors to commit the wrongs, trespasses, injuries, etc., as alleged in said plaintiffs' petition.

The court overruled the plea in abatement and general and special exceptions of

the defendants, to which ruling of the court the defendants excepted, and the cause proceeded to trial upon the merits of the case, and the court, after hearing the evidence, entered his order and judgment perpetuating the temporary injunction theretofore granted, and perpetually enjoined the defendants from forcibly dipping and from causing and demanding the plaintiffs and others to dip their cattle.

The appellants have presented in the brief numerous assignments of error and propositions. The length to which this opinion would be extended thereby forbids a statement and discussion in detail of these several assignments and propositions. The contentions made for a reversal of the case will be sufficiently indicated by what we shall say without such statement and discussion.

[1] 1. There was no error in overruling appellants' plea in abatement. The live stock sanitary commission was not, in our opinion, a necessary party to the suit. The action is an equitable proceeding, and the allegations are to the effect that the defendants named wrongfully and without authority of law committed the trespasses and wrongs complained of, which had already resulted in serious damage to plaintiffs' property, and that, unless enjoined, they would continue by the same or similar acts and methods to damage and destroy their property. The plaintiffs were not bound to join all the tort-feasors in the action. The rule of joinder in the case of a joint tort is that the plaintiff may join in his suit one, or any, or all, of several joint wrongdoers. By the allegations and prayer of their petition plaintiffs asked injunctive relief against the defendants as the immediate and active parties about to do the injurious things sought to be prevented. It is no reason for refusing an injunction that defendant in committing the injurious acts did not act for himself and received no benefits, nor that he was the only guilty party. 32 Cyc. p. 786.

[2] 2. Nor do we think the court erred in overruling defendants' exceptions to plaintiffs' petition charging a misjoinder of plaintiffs and defendants. The plaintiffs under the allegations of the petition had the right to join with each other in asking the relief sought. They were not seeking to recover a money judgment for the injuries alleged to have been inflicted upon the live stock owned by them respectively. They were all similarly situated, had suffered similar damage, and many of them a destruction of their property at the hands of the defendants. They were threatened with a repetition of such damage and probable destruction of property. They were seeking not distinct and different relief, but all were praying for the same relief to prevent future threatened and impending damage of the same character. The rule seems to be well established that—

"It is not essential that the interest of the separate plaintiffs should be of the same degree or of one kind." "Persons may unite as plaintiffs, although their rights or titles be entirely distinct and unconnected where they are invaded or threatened by the same act calling for similar relief." 16 Cyc. p. 199.

If all the plaintiffs have some common interest in respect to the subject-matter of the suit, and each is interested in the same relief asked by the other, or some part of it, their joinder is proper. 30 Cyc. 118.

Again, it has been held that where the wrongful act will injure many persons in a similar way, interfering with the common right of each, they may unite in a bill to restrain the commission of the act. 22 Cyc. p. 767.

[3] 3. This being an action ex delicto, and for injunctive relief, it may be said, in reference to the joinder of the several defendants herein, that the entirety of obligation which exists in the law of contracts is not recognized in torts, and, according to the authorities, "the distinction is marked in the difference between an action for an injunction and an action for pecuniary damages when both actions turn upon an injury arising out of the acts of different defendants between whom there has been no common design or concert of action, but whose independent acts have in fact united, as their common result, in an invasion of plaintiffs' rights." It is said that when plaintiff seeks an injunction against the continuance of this common result, he may join all the defendants in one action. But that when he sues to recover his damages because of his injury from these separate independent wrongdoers, he cannot join them as defendants in one action. As has been pointed out, this is not a suit by the plaintiffs to recover damages on account of injury suffered as a result of the alleged acts of the defendants, but is a suit to enjoin the defendants from committing threatened wrongful and injurious acts. According to the allegations of plaintiffs' petition the defendants were holding similar positions, had committed, and were threatening to commit, the same acts by the same methods. It does not appear that any harm has resulted to defendants, or either of them, by the joinder of the several persons as plaintiffs herein. Nor does it appear that either of the defendants has suffered any injury as a result of being joined as a codefendant herein. It is evident, however, that by the joinders a great number of similar suits has probably been avoided. The trial court correctly held that the defendants' exceptions to the petition on the ground that there was a misjoinder of plaintiffs and defendants were not well taken.

[4] 4. The general demurrer and special exceptions to plaintiffs' petition and the plea of intervention filed by John Ferguson et al. were also correctly overruled. The allega-

tions of the petition, which were adopted by the interveners, are sufficiently specific as to the nature of the threatened acts sought to be prevented, the persons threatening such acts, and the injury or damage that will result therefrom. The effect of the allegations is to charge that the wrongful and injurious acts which plaintiffs seek to restrain were threatened and about to be committed by all the defendants acting together without just cause or authority of law, and it was not essential to their right to the relief prayed for to allege whether or not the threatened acts and impending commission of them proceeded from a purpose to enforce what is known as the "Tick Eradication Law" of this state. Plaintiffs alleged, in effect, that the law referred to was not in operation in this county, and that the fluids, chemicals, and poisons" into which the defendants were threatening to force their cattle to be dipped did not conform to the formula prescribed for use in tick eradication, but was too strong, very poisonous and dangerous, and that, on account of its character and quality and the manner and means employed by defendants in forcing their live stock to jump or fall into the vats filled with such fluids and chemicals, said live stock had been made sick, badly injured, and many of them killed, and that unless such unauthorized conduct of defendants was enjoined and prevented by the court, defendants would continue to employ such process, means, and methods in the future, and forcibly compel plaintiffs to drive their stock into said vats, and thereby cause them to suffer irreparable injury.

[5] 5. The claim that plaintiffs' petition was obnoxious to special exception because it did not allege facts showing that plaintiffs would suffer irreparable injury as the result of the acts which it is alleged defendants were about to commit, unless restrained, is not, we believe, supported by the record. It has been held that acts that will cause the destruction of complainant's property, or that will interfere with the carrying on of his business, or with the use of his property, do an irreparable injury. The allegations of plaintiffs' petition show that if the defendants are not restrained from committing the alleged threatened acts plaintiffs' live stock in all probability will be seriously crippled, bruised, and injured thereby, and some of them killed. They further show that as a result of the dipping of their milch cows there will be a total or at least partial loss of the milk and butter derived from them for the use of their respective families. It is also an established rule that an injury is irreparable when it cannot be adequately compensated in damages, or when there exists no pecuniary standard for the measurement of the damage. The facts alleged in the present suit make applicable, it occurs to us, the rules to which we have just referred.

From them it may reasonably be deduced, notwithstanding there is no allegation that defendants are insolvent, that plaintiffs cannot be adequately compensated in damages, especially for the loss of their milch cows and the milk and butter which they charge will result from the alleged unauthorized acts and conduct of the defendants unless restrained, and that no pecuniary standard for the measurement of such damage exists. But, however this may be, it is statutory in this state that writs of injunction may be granted in cases where it appears that the party applying for such writ is entitled to the relief demanded, and such relief, or any part thereof, requires the restraint of some act prejudicial to the applicants. Vernon's Sayles' Civil Statute, art. 4643.

[6] 6. We are of the opinion that the trial court erred in holding that defendants derived no power or authority by virtue of the election held under the act of the Legislature of 1913 for the purpose of determining whether Dallas county should take up the work of tick eradication in said county, and to dip or cause to be dipped any of plaintiffs' or interveners' live stock in the dipping vats described in the pleadings. The contention of defendants to the effect that, since said election had been validated by an act of the Thirty-Fifth Legislature passed at its first called session in 1917, the trial court was without authority to declare said election of no effect should be sustained. The fact that the plaintiffs' suit was one for injunctive relief and not a contest of the election in question, and no contest thereof had been filed, did not militate against their right to allege and prove, if such was a fact, that said election was absolutely void and afforded defendants no justification for the injurious acts already committed and about to be committed by them. But the important question here suggested is, Did the Legislature have authority to validate, by the act of May 12, 1917, the election of April 3, 1917? This question is not entirely free from difficulty, but we have concluded that it should be answered in the affirmative. That said election was held without authority of law, and therefore, unless vitalized by the "Validating Act" referred to, was without force or effect, may be conceded. As a matter of fact, the election procedure was inaugurated under the provisions of chapter 169, Acts of the Thirty-Third Legislature, the record showing that the petition for the election was filed and presented to the commissioners' court of Dallas county February 12, 1917; that it was granted on that day, the election ordered held April 3, 1917, notice thereof posted March 2, 1917, and the election held as ordered. Before the election was held, however, and on March 6, 1917, the Thirty-Fifth Legislature, then in session, repealed said chapter 169 of the Thirty-Third Legislature, and enacted a

new statute on the subject of tick eradication, which took effect on the day of its passage. Thus the statute authorizing the election in question was abrogated and superseded by the new statute referred to, and it is doubtless true that defendants could derive no warrant from it for the dipping of plaintiffs' cattle unless said election was lawfully validated and given effect by the act of May 12, 1917. By the last-named act it is provided that all elections held in any county of this state for the purpose of determining whether such county should take up the work of tick eradication in said county under the provisions of section 8, chapter 169, Acts of the Regular Session of Thirty-Third Legislature (Vernon's Sayles' Ann. Civ. St. 1914, art. 7314e), wherein the petition was filed, orders of election made, and notice thereof given prior to the taking effect of the act passed March 6, 1917, and the election so ordered was held at a date subsequent to the taking effect of said act, are in all things validated, and shall be by all the courts of this state held to be valid elections just as though the same had been ordered and held prior to the taking effect of said act of March 6, 1917.

7. Numerous cases may be found which hold that retrospective laws are not obnoxious to constitutional objection, while in others they have been held to be void. It has been said, which seems to be true, that the different decisions have been based upon diversities in the facts which make different principles applicable. That the Legislature may pass statutes which reach back to and change or modify the effect of prior transactions, provided retrospective laws are not forbidden, eo nomine, by the state Constitution, and no other objection exists to them than their retrospective character, seems to be well established. So that validating or curative statutes enacted for the purpose of curing defects or confirming rights constitute a valid exercise of legislative power. The general rule seems to be that—

"It is competent for the Legislature to give retrospectively the capacity it might have given in advance, and to dispense retrospectively with any formality it might have dispensed with in advance." Cooley, Prin. of Const. Law, 325.

Likewise, Mr. Cooley in his work on Constitutional Limitations, p. 457, says, in substance, that if the thing which constitutes the defect in the proceeding is something that the Legislature might have dispensed with by a prior statute, then a subsequent statute dispensing with it retrospectively must be held valid; and that if the defect consists in doing something which the Legislature might have made immaterial by prior law it may be made immaterial by subsequent law. Again, section 23 of article 16 of our Constitution is as follows:

"The Legislature may pass laws for the regulation of live stock and the protection of stock raisers in the stock-raising portion of the state, and exempt from the operation of such laws other portions, sections or counties; and shall have power to pass general and special laws for the inspection of cattle, stock and hides, and for the regulation of brands; provided. that any local law thus passed shall be submitted to the freeholders of the section to be affected thereby, and approved by them before it shall go into effect."

We think it was competent, under this provision of the Constitution and the principles announced, for the Legislature to validate and make effective the election in question. The Supreme Court and Court of Criminal Appeals of this state have both expressly held that under said section of the Constitution the Legislature has the power to enact a law regulating live stock, and to make it applicable to the entire state or to a given county or subdivision of a county, and that such law could be made effective by direct enactment, or the Legislature could provide for submitting the law to direct vote of the freeholders in the locality to be affected thereby. Armstrong v. Traylor, 87 Tex. 598, 30 S. W. 440; Ex parte Thompkins, 47 Tex. Cr. R. 359, 83 S. W. 379; Munsey v. State, 194 S. W. 953. Since, therefore, the Legislature was empowered by the section of the Constitution quoted above to pass a law for the protection of the live stock industry of Texas against malignant, infectious, or communicable diseases and for the eradication of the fever carrying tick, and to make such law applicable to and effective in any given county of the state by direct enactment without submission of it to a vote of the freeholders in the locality to be affected, the election of April 3, 1917, could be vitalized and rendered effective by the validating statute of May 12, 1917. Having authority by direct enactment to pass and put into operation a law against splenetic fever and for the eradication of the fever carrying tick, it was not beyond the power of the Legislature to confirm and validate the election in question by subsequent statute. The case of Town of Fox v. Town of Kendall, 97 Ill. 72, is very much in point. In that case it was declared by the Supreme Court of Illinois that an election to determine whether each township of the county should support its own paupers, which was held before the law authorizing such election had taken effect, could be validated by a subsequent statute. The court said, in effect, that since the General Assembly of the state might have enacted the law on the subject and declared it in force without submitting it to a vote of the people, such vote was immaterial to the validity of the act, and the election, although held without authority of law, could be validated and given effect by a curative statute. If no publication of the result of the election

had been made, that defect in the proceedings was unquestionably cured by the validating statute discussed, and of itself affords the plaintiffs no cause of complaint at the alleged action of the defendants. Our conclusion is that the trial court erred in holding that the defendants derived no authority from the election of April 3, 1917, to dip or to cause the forcible dipping of any live stock belonging to plaintiffs or interveners. And this conclusion renders it unnecessary for us to decide whether or not the live stock sanitary commission has the authority to declare a quarantine and require unqualifiedly the forcible dipping of live stock under rules promulgated by it, without an election. We will say, however, that it seems clear that the commission is authorized to declare a quarantine to prevent the shipping of live stock, or their removal from place to place, affected with splenetic fever or fever carrying tick and to require the treatment of them for such disease and the eradication of such tick as a prerequisite to shipment or such removal independently of the provision of the statute authorizing an election to determine whether the county will take up the work of tick eradication in the county.

[7] 8. Notwithstanding the election of April 3, 1917, was validated by the enactment of May 12, 1917, and the county of Dallas thereby empowered to take up the work of tick eradication, was the trial court authorized by the pleadings and the evidence introduced to grant plaintiffs and interveners any of the relief asked? We think so. They alleged and the evidence was sufficient to warrant the conclusion that defendants by their commands and threats forced them against their will and wishes to dip their cattle in liquid, chemicals, and poisons not conforming to that prescribed for treatment of splenetic fever or the eradication of fever carrying tick, and that as a result thereof many of their cattle were injured, crippled, and poisoned, and some of them killed; that defendants were commanding plaintiffs to again dip their cattle in the same poisons and dangerous liquid and chemicals, and threatened that if their command was not obeyed plaintiffs would be reported, arrested, and prosecuted for their disobedience, and fined in sums ranging from $25 to $100, and that defendants, together with the sheriff of Dallas county, would enter upon plaintiffs' premises, seize their cattle, and dip them in said poisonous liquid and chemicals themselves; that no inspection whatever of plaintiffs' cattle, with the view of ascertaining whether they were affected with splenetic fever, fever carrying tick, or other malignant infectious or communicable disease, had been made, and as a matter of fact none of them were so affected, or had been exposed to 'the same; that defendants intended to and would carry out their threats to dip plaintiffs' cattle in said poisonous liquid again unless restrained by the process of the court; and that in consequence of such dipping they would suffer irreparable injury.

The evidence was conflicting, but sufficient to justify the court in finding, as it did, the existence of the facts stated. Such facts, in our opinion, warranted the interposition of a court of equity, and to the extent of restraining defendants from forcing plaintiffs to again dip their cattle in the poisonous chemical referred to, or defendants themselves from such dipping, the injunction granted was authorized. It was not necessary, perhaps, for the live stock sanitary commission, or the defendants as inspectors operating under the statute enacted for the protection of the live stock industry of this state against malignant, contagious, and infectious or communicable diseases to have inspected each head of cattle to determine whether or not it was affected with some such disease, or the fever carrying tick before they would be authorized to dip for the eradication of such tick, but we do believe that before said commission or its agents or inspectors are authorized to require cattle to be dipped, or to dip them themselves for the purpose of eradicating the fever carrying tick, it is a prerequisite that an inspection or proper investigation be made, and that such inspection or investigation shall disclose the existence of such disease or the presence of such tick, or that the animals are "affected with the agency or transmission of said disease, or have been exposed thereto, and hence the necessity for such dipping." Trimble v. Hawkins, 197 S. W. 224.

The evidence in the present case shows that a quarantine had been established and proclaimed around Dallas county, and that defendants had been appointed and were acting as inspectors under the live stock sanitary commission, and, practically without contradiction, that splenetic fever did exist in Dallas county at the time plaintiffs were required to dip their cattle, but that none of plaintiffs' animals were affected with such fever, or had fever carrying ticks on them. If, however, it be admitted that a proper investigation had been made and conditions found to exist that warranted the forcible dipping of plaintiffs' cattle, still defendants were not authorized to use a dip which did not conform to that prescribed and which was so poisonous as to seriously injure or kill the stock. The correctness of this view is impliedly admitted in defendants' proposition under their fifty-third assignment of error. That the dip used was entirely too strong and evidently not prepared in accordance with the formula adopted for tick eradication is clearly evidenced by the death of some of plaintiffs' cattle as a result of its use and the very serious injury done to others thereby. There was also competent evidence to justify the conclusion that unless restrained defendants would continue to dip plaintiffs'

cattle in this destructive mixture and poisons. We are not, therefore, prepared to say that the trial court erred in finding that plaintiffs and interveners would suffer much loss and damage by the continuation of the dipping of their cattle in said dip, and that such dipping, damage, and loss will occur again in the future unless defendants are enjoined from the use thereof. We are not to be understood as holding that where the conditions exist which authorize the dipping of live stock for tick eradication and the official dip is being used, inspectors may be enjoined from dipping for that purpose solely on the ground that some injury, which might naturally or ordinarily result from such treatment, may be thereby inflicted upon the stock.

[8] 9. The allegations of the petition and the evidence were sufficient to raise the issue that the mixture in which defendants threatened to again dip plaintiffs' cattle was not properly proportioned or mixed and was not the official dip to be used in the eradication of the fever carrying tick. The court found upon testimony justifying it, among other things, that the defendants had control of the dipping vats, were present at the dippings of their cattle, and mixed and poured the "poisons" therein from time to time, and that said vats had never been emptied from the time they were first filled; that on each dipping day they poured additional arsenic poison therein, and in addition to said poisons the vats contained the accumulated filth necessarily resulting from the dipping of hundreds of cattle.

10. Complaint is made of the scope and extent of the court's judgment and the injunction granted. This complaint is in part at least well founded. The judgment recites that the defendants are thereby "enjoined from forcibly dipping and from causing or demanding that the cattle, horses, and mules of plaintiffs and interveners be forcibly dipped in said vats under or by virtue of said election held on April 3, 1917, or under and by virtue of the repealed statute of 1913 under any circumstances, and are enjoined from forcibly dipping and causing and demanding that the live stock of said plaintiffs and interveners be dipped under the act of the Legislature of 1917 until after said act is submitted to and approved and adopted by the voters of Dallas county at a local option election held for that purpose in the future." The said election of April 3, 1917, having been validated by the act of May 12, 1917, the court erred in holding that defendants derived no authority by virtue of said election to proceed with the work of tick eradication in Dallas county, and in enjoining defendants from operating thereunder. The court was also in error in restraining defendants from forcibly dipping and from causing and demanding that the live stock of plaintiffs and interveners be dipped under the act of the Legislature of 1917, until said act was submitted to and adopted by the voters of Dallas county at an election held for that purpose, because it is expressly declared in section 9 of said act (Vernon's Ann. Civ. St. Supp. 1918, art. 7314g):

"That immediately after March 1, 1919, the live stock sanitary commission shall make and certify to the Governor of Texas a list of the names of the counties in zone No. 1 that have not been freed from ticks and released from quarantine by the live stock sanitary commission; whereupon the Governor shall issue his proclamation proclaiming a quarantine in and around such counties, and thereafter all of such counties shall take up the work of tick eradication, and shall be subject to all of the provisions of, this act whether or not they shall have held an election as provided in section 7 of this act."

This part of the judgment is also wrong, perhaps, for the reason that the court was not authorized by the facts pleaded and law applicable to adjudicate in advance the question of defendants' right or authority to proceed with the work of tick eradication without an adoption of said act by the voters of Dallas county.

[9] 11. The judgment is also to the effect that on and after March 1, 1917, or in the event an election should be held and said act approved and adopted by the voters of the county, defendants and their successors be enjoined from dipping or causing to be dipped plaintiffs' and interveners' cattle, unless they first make a personal inspection of the animals and find the fever carrying ticks on them or find the animals infected with splenetic fever, etc. If it is meant by this that each animal must be inspected and some one of the conditions found to exist which authorizes the work of tick eradication before such animal may be dipped or the work of tick eradication proceeded with, we do not agree with the court. Our views with respect to the extent of the inspection required to authorize the work of tick eradication is briefly stated in a former part of this opinion. Besides, as we have above indicated, we do not think it was the province of the court to determine in advance the rights the defendants, or their successors, would possess under the act of the Legislature of 1917, and enjoin them from doing those things by virtue of said act which the court believed they were not authorized to do except upon certain conditions.

12. The judgment of the court further enjoins defendants and their successors "from threatening to report plaintiffs and interveners to the officers for the purpose of having them arrested for their failure to have their stock dipped until and unless the conditions or diseases mentioned in the statute are first found to exist by a personal inspection of the animal or animals. As we have held, the law does not impose upon defendants and their successors the duty of making

a "personal inspection" of each animal as a prerequisite to their right to dip or to require the dipping of live stock for the purpose of tick eradication. The investigation or inspection required as we understand the law is stated above in this opinion, and our views upon the subject need not be repeated.

[10] 13. We think the court erred in rendering judgment perpetuating the injunction and taxing costs against the defendants Epps G. Field and A. T. Castleman. The undisputed evidence shows that defendant Fields resigned before the institution of this suit, and the defendant Castleman before trial, and there is no evidence that either of them was threatening or intended to act as inspector in the threatened future dippings of plaintiffs' cattle. The assignments asserting that the court erred in perpetuating the injunction and taxing costs against other named defendants are believed to be without merit and will be overruled.

14. Except as indicated, the assignments disclose no reversible error.

15. In accordance therefore with the views expressed in this opinion the judgment of the district court, in so far as its effect is to enjoin defendants from dipping plaintiffs' cattle or causing them to be dipped again in the fluids, liquid, and poisons in which they were dipped causing the injuries complained of in this action, and in which they threatened to dip them in the future will be affirmed; and in so far as it enjoins defendants and their successors from threatening to report plaintiffs and interveners to the officers for the purpose of having them arrested for their failure to have their stock dipped until and unless the conditions or diseases mentioned in the statute are first found to exist by a personal inspection of each animal; and from forcibly dipping plaintiffs' cattle or causing them to be dipped under and by virtue of the election held on April 3, 1917; and from dipping said cattle or causing them to be dipped under the act of the Legislature of 1917 until said act is submitted to and approved and adopted by the voters of Dallas county at an election for that purpose; and from dipping plaintiffs' cattle or causing them to be dipped after March 1, 1919, unless they first make a personal inspection of each animal and find fever carrying ticks on them; and in so far as it enjoins them from dipping plaintiffs' cattle or causing them to be dipped, even though an election should be held and said act adopted by the voters of Dallas county unless they first make a personal inspection of the animals and find the fever carrying ticks on them or find them affected with splenetic fever, etc., is reversed, and the injunction granted upon those grounds and to that extent dissolved.

16. The judgment perpetuating the injunction against the defendants Epps G. Fields and A. T. Castleman, and taxing costs of suit against them, is reversed, and judgment here rendered in their favor.

Affirmed in part and reversed and rendered in part.

⬅For other cases see same topic and KEY-NUMBER in all.Key-Numbered Digests and Indexes