### NEAL et al. v. BOOG–SCOTT et al.
#### (No. 914.)

(Court of Civil Appeals of Texas. Beaumont. Jan. 4, 1923. Rehearing Denied Feb. 7, 1923.)

1. Taxation ⬲38—Expenditure of money under Tick Eradication Law for public purpose within Constitution.

The Tick Eradication Law, embraced in Vernon's Ann. Civ. St. Supp. 1922, art. 7314d, requiring county commissioners' courts to assist the Live Stock Sanitary Commission in protecting live stock from certain diseases, is not unconstitutional as in violation of Const. art. 8, § 3, providing that taxes shall be levied only for public purposes.

2. Animals ⬲29—Tick Eradication Law within authority of Legislature.

The Tick Eradication Law (Vernon's Ann. Civ. St. Supp. 1922, art. 7314d), requiring counties to co-operate with the Live Stock Sani-

tary Commission in the eradication of specified diseases of animals, is within the express authority of Const. art. 16, § 23, authorizing the Legislature to enact laws for regulation of live stock and protection of stock growers.

**3. Constitutional law ⚖➙70(3)—Public character of Tick Eradication Law for legislative determination.**

The Tick Eradication Law (Vernon's Ann. Civ. St. Supp. 1922, art. 7314 et seq.) by its enactment indicated the legislative determination that the expenditure of money for protection of stock and stock growers against animal diseases was for a public purpose, and such legislative determination, unless manifestly arbitrary and incorrect, is not reviewable by the courts.

**4. Counties ⚖➙153½—Tick Eradication Law not authorizing expenditure for private purposes.**

It is common knowledge that the live stock industry of Texas is a primary and important industry subject to waste and injury by communicable animal diseases, and that the protection of stock against disease would be of benefit both to industry and public health, and the court cannot say as a matter of law that the Tick Eradication Law (Vernon's Ann. Civ. St. Supp. 1922, art. 7314 et seq.), authorizing the expenditure of public moneys, was an arbitrary and incorrect determination by the Legislature to expend public moneys for other than public purposes.

**5. Constitutional law ⚖➙43(1)—Unreasonableness of limitation for filing protest under Tick Eradication Law not ground of complaint by parties filing protests acted on.**

Stock owners, showing that their protests were filed and acted on, cannot complain that the Tick Eradication Law (Vernon's Ann. Civ. St. Supp. 1922, art. 7314k3), allowing stock raisers who are ordered to dip their animals five days' time for filing protest with the Live Stock Sanitary Commission, is invalid on the ground that the time for filing protest is unreasonable and insufficient.

**6. Eminent domain ⚖➙2(2) — Stock growers not compelled to dip animals in injurious compound without compensation for damage.**

The Tick Eradication Law (Vernon's Ann. Civ. St. Supp. 1922, art. 7314 et seq.) making no provision for payment to stock raisers for damages suffered from dipping his cattle as required by the inspectors, *held* that, the material in which complainants were ordered to dip their cattle was so poisonous or injurious as to result in death or serious injury to stock, the complainants cannot be required to comply therewith, and thus have their property taken, destroyed, or damaged without compensation.

**7. Injunction ⚖➙118(2)—Owner's petition for injunction against requiring dipping of cattle sufficiently alleged damages.**

Stock grower's petition to enjoin inspectors from requiring the dipping of animals under Tick Eradication Law (Vernon's Ann. Civ. St. Supp. 1922, art. 7314 et seq.) alleging the "dip" to be dangerous and injurious, and that to dip complainants' stock therein would cause inevitable and considerable damages for which the statute provides no compensation, raised an issue of fact, which if supported by satisfactory evidence would entitle the complainants to the relief sought.

**8. Injunction ⚖➙105(2)—Criminal prosecution enjoined where injury to property is involved.**

The rule that a court of equity will not interfere by injunction to prevent a criminal prosecution is subject to the exception that a threatened criminal prosecution under a void law may be enjoined where it is shown that injury and destruction of property will also result.

Appeal from District Court, Liberty County; J. L. Manry, Judge.

Suit for injunction by Dave Neal and others against J. E. Boog-Scott and others. From an order denying relief, plaintiffs appeal. Reversed and remanded.

Jno. M. Conley and Jas. A. Harrison, both of Beaumont, for appellants.

J. Llewllyn and P. C. Matthews, both of Liberty, for appellees.

HIGHTOWER, C. J.   This suit was instituted in the district court of Liberty county by Dave Neal and a number of other citizens of that county against the Live Stock Sanitary Commission of Texas and the local state inspector and county inspectors of that county, the purpose of the suit being to enjoin said defendants from compelling the plaintiffs to dip their cattle, as they had been ordered to do by the defendants, under the provisions of the Tick Eradication Law of this state. There was a prayer for a temporary injunction, and when the petition was presented to Hon. J. Manry, judge of the Ninth judicial district, he set the same down for hearing at a later date, and upon hearing sustained a general demurrer interposed by the defendants, and, the plaintiffs declining to amend, the injunction was refused, and from that order the plaintiffs have appealed to this court.

[1, 2] Appellants' first contention is that the action of the trial court, sustaining the general demurrer, was erroneous, because the Tick Eradication Law, as embraced in article 7314d, Vernon's Texas Civil Statutes 1922, is clearly unconstitutional, in that the same provides that the expense of enforcing the law shall be paid by Liberty county out of the public funds of the county, which would be in violation of section 3, article 8, of the Constitution of this state, providing that—

"Taxes shall be levied and collected by general laws and for public purposes only."

---

⚖➙For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

By article 7314d, supra, it is provided:

"It shall be the duty of the county commissioners' courts to co-operate with and assist the Live Stock Sanitary Commission in protecting the live stock of their respective counties for all malignant, contagious, infectious or communicable diseases, whether such diseases exist within or outside the county, and otherwise protect the live stock interests of their counties. It shall be the duty of said commissioners' courts to co-operate with the Live Stock Sanitary Commission and the officers working under the authority or direction of said commission in the suppression and eradication of fever-carrying ticks, and all malignant, contagious, infectious, or communicable diseases of live stock; provided when it becomes necessary to disinfect any premises, county or subdivision of the county infected with fever-carrying ticks, anthrax, hog cholera, glanders, foot and mouth diseases, bovine tuberculosis or contagious abortion, under order of the Live Stock Sanitary Commission, the county judge of the county where the said premises are located, shall have such disinfecting done at the expense of the county, and according to the rules and regulations of the Live Stock Sanitary Commission, and the said commissioners' courts are hereby authorized and empowered and directed to appropriate moneys out of the general fund of their counties, to incur indebtedness by the issuance of warrants and to levy a tax to pay the interest thereof, and provide for a sinking fund in payment thereof for the purpose of purchasing, constructing or leasing necessary public dipping vats within their counties, and for the purchase of dipping material and other materials, and for the hire of labor necessary to destroy the diseases and carriers herein mentioned; provided, that for such permanent improvements, funds may be expended out of the general fund of the county; provided, further, that said warrants shall draw interest at a rate not exceeding six per cent. per annum; and provided, further, that all warrants issued under this chapter shall run not exceeding twenty years from the date thereof."

It is appellants' contention on this point that the expenditure of money out of the general fund of Liberty county raised by taxation, as provided for under the article above quoted, for the purpose of protecting stock and stock raisers against the ravages of ticks and the diseases mentioned in the article, would be to expend such money not for a public use or purpose, but, on the contrary, that such expenditure would be solely and exclusively for the use and benefit of the owners of such stock, and therefore such expenditure of the public money would be for private use, and that this would be in violation of section 3, article 8, of the Constitution of this state, above quoted, prohibiting the levying and collection of taxes for other than public purposes, and that therefore the statute quoted is unconstitutional. This court has given appellants' contention careful and thorough consideration, and we have concluded that the contention cannot be sustained.

[3] The Legislature of this state, in enacting the statute, has declared, by clear implication at least, that the protection of stock and stock raisers of this state against the ravages of fever-carrying ticks and the several diseases mentioned in the statute will serve a public purpose or use, and will redound to the public welfare of the state. By section 23, article 16, of the Constitution of this state the Legislature was authorized to enact laws for the regulation of live stock and the protection of stock raisers in the stock-raising portions of the state, and, therefore, in enacting the statute in question, the Legislature was clearly within the express authority granted by this provision of the Constitution; and if the purpose of the law be a public one, the act does not conflict with section 3, article 8, of the Constitution, as contended by appellants.

The question as to whether an act of the Legislature of this state will serve a public use or purpose is, in the first instance, a question for the determination of the Legislature, and that determination or decision cannot be reviewed and the contrary determined by the judiciary except in instances where the legislative determination of the question is palpably and manifestly arbitrary and incorrect. As said by Judge Cooley:

"The moment a court ventures to substitute its own judgment for that of the Legislature, in any case where the Constitution has vested the Legislature with power over the subject, that moment it enters upon a field where it is impossible to set limits to its authority, and where its discretion alone will measure the extent of its interference. The rule of law upon this subject appears to be that, except where the Constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operate according to natural justice or not in any particular case. The courts are not the guardians of the rights of the people of the state, except as those rights are secured by some constitutional provision which comes within the judicial cognizance. The protection against unwise or oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil; but courts cannot assume their rights." Cooley's Const. Lim. 167, 168.

Again, the learned author, at pages 128, 129, says:

"The Legislature is to make laws for the public good and not for the benefit of individuals. It has control of the public moneys, and should provide for disbursing them for public purposes only. Taxes should only be levied for those purposes which properly constitute a public burden. But what is for the public good, and what are public purposes, and what does properly constitute a public burden, are questions which the Legislature must decide upon its own judgment, and in respect to which it is vested with a large discretion which can-

not be controlled by the courts, except perhaps where its action is clearly evasive, and where, under pretense of a lawful authority, it has assumed to exercise one that is unlawful."

[4] As we stated above, when the Legislature of this state enacted the statute in question, it declared, by clear implication at least, that the protection of stock and stock raisers against the ravages of ticks and the diseases mentioned in this statute would redound to the public good and the welfare of this state, and that the law would serve, therefore, a public purpose or use. The Legislature having so determined, an inquiry on the point by the courts is not permitted, unless the courts are able to point out that the legislative determination is palpably and manifestly arbitrary and incorrect. So the question now for determination before us is: Was the determination of our Legislature, in enacting the statute in question, that the protection of the live stock and the stock raisers of this state against the ravages of ticks and the diseases mentioned in the statute would be for the public use, palpably and manifestly arbitrary and incorrect? We have concluded that no court could reasonably so decide. It is a matter of common knowledge that the live stock industry of this state is one of its primary and most important industries, and one that should be fostered by the lawmaking power of the state, in so far as may be done within constitutional limitations. The great economic waste that was known to result to that industry in this state in consequence of the fever-carrying tick and the contagious and communicable diseases mentioned in the statute was, perhaps, one of the incentives which prompted the Legislature to enact the law in question; and it seems to us that it ought to be conceded that any law which has the effect to prevent or greatly minimize such economic waste in such an industry as that of stock raising in this state is for the public welfare and benefit of the people of this state.

We think, also, that it was not unreasonable for the Legislature to conclude that the protection of live stock against disease would be to the benefit of the health of the people in general of this state, for it is a matter of common knowledge that cattle and hogs afford a large portion of the food consumed by the citizens of this state, and certainly it is reasonable to conclude that the public health will be benefited by protecting the people against food from diseased animals that might be slaughtered and put upon the market for consumption. It is very probable that both these considerations, that is to prevent the great economic waste to the stock-raising industry and to promote the health of the people of the state, had weight with the Legislature in determining the advisability and propriety of the legislation here in question.

If the law serves either of these purposes, it cannot be denied that the expense of enforcing it in the several counties of the state would be for a public use, and ought to be defrayed out of the public funds of such counties. We think that the point under consideration was determined adversely to appellants' contention in the case of Weaver v. Scurry County (Tex. Civ. App.) 28 S. W. 836, by one of our own appellate courts. In that case the plaintiff, Weaver, sued Scurry county for bounties claimed to be due him under the statute there under consideration, for killing wolves and other wild animals which preyed upon stock. The county defended upon the ground that the statute allowing the bounties was violative of section 3, article 8, of our Constitution, for the reason that the killing of such wild animals served no public use or purpose, but only inured to the benefit of the owners of stock killed by such animals. The trial court accepted the defendant's view on the point, and held the legislation unconstitutional. On appeal, such action was reversed, and the constitutionality of the act in all things upheld, on the ground that the killing of such animals, which were so destructive of stock, served a public use or purpose. In principle, the holding in that case cannot be distinguished from the views we have here expressed. In so far as we have been able to ascertain, the Supreme Court of the state has never had occasion to review the decision in the Weaver Case, but it was cited with approval in the case of Choice v. City of Dallas, 210 S. W. 755, by the Dallas Court of Civil Appeals.

We have no doubt that the statute here in question, because it provides for payment out of the public funds of the several counties of this state compensation for the enforcement of the law, is not violative of section 3, article 8, of the Constitution, as claimed by appellants, and therefore overrule that contention.

[5] It is further contended by appellants that the trial court was in error in sustaining the general demurrer, because appellants say that the five day's time for filing protest with the Live Stock Sanitary Commission by stock raisers who are ordered to dip their stock, as provided by article 7314k3, Vernon's Texas Statutes, 1922 Supp., is clearly unreasonable and insufficient, and that such stock owners are not thereby provided sufficient time in which to file such protest. In order to agree with appellants' contention on this point, we would have to conclude that the five days mentioned in the article quoted for filing the protest by the stock owner is clearly unreasonable as a matter of law, and this we cannot do, and we have been cited to no authority supporting such contention, and have been able to find none upon the point. In this case, however, the question of the sufficiency or insufficiency of the time for filing

protest by the stock owner against the order to dip is not involved, because it is clear from the allegations in the petition that the protests were filed by the plaintiffs with the Live Stock Sanitary Commission and were acted upon, and therefore we can see no grounds for complaint by appellants in this connection. The contention is overruled.

[6, 7] It is further contended by appellants that the trial court was in error in sustaining the general demurrer interposed by the defendants, for the reason that it was alleged, substantially, in the plaintiffs' petition that the dipping solution in which their stock were ordered to be dipped is very detrimental and seriously injurious to stock, and that it kills some of the stock and renders others poor and unhealthy; practically ruins the hides of the cattle dipped in such material, and causes the plaintiffs' milch cows to go practically dry after such dipping, and that the stock cows are so dried up in milk by reason of such poisonous material that their calves do not have sufficient nourishment, and are made poor and then and thereby exposed to disease. In this contention, the petition shows that the law makes no provision for compensation to stock owners for such damages and loss and destruction of stock, and they allege that they have no legal remedy against such damages and loss as they would sustain if compelled to dip their cattle in the material furnished for that purpose, and that to compel them to dip their stock in such material would be equivalent to taking their property without due process of law or destroying it without any compensation to the owners therefor. As we have shown, there was no evidence introduced upon the hearing of the petition for temporary injunction, but instead the trial court sustained a general demurrer interposed by the defendants. If it be true that the material in which appellants were ordered to dip their cattle was so poisonous or severe as to result in the death of their stock, or some of such stock, and the destruction of their milch cows, and the serious injury of their stock cows to such an extent as to dry them up in milk and thereby render their calves poor and weak and make them subject to easy attack by disease, and all this because of the character and quality of the dip ordered to be used, then we think that the petition on that count showed grounds for equitable relief by the court, and entitled appellants to the injunction sought. We do not understand that there is any provision made by the Tick Eradication Law, in any of its provisions, whereby the owners of stock are protected by compensation provided for the death and injury to stock caused by the material used in dipping them, nor are we aware of any rule of law under which appellants would be entitled to recovery of compensation against the state or the county for damages sustained in consequence of dipping their cattle in such materials. Therefore, if it be true, as alleged by appellants, that the material or liquid which they were ordered to use in dipping their stock was of such poisonous nature as to kill their stock or seriously injure them, and thereby cause damage to appellants in the respects claimed by them, when such material or dip is carefully and properly applied, then we think that to force appellants to use such dip, notwithstanding such effects upon their stock, would be equivalent to taking and destroying and damaging their property without any compensation being provided therefor, and that such could not be permitted under the Constitution of this state. Such was substantially the holding in Castleman v. Rainey, 211 S. W. 630. True, in that case, the dip used for the stock was not the "official dip," and that fact was several times mentioned throughout the opinion in that case; but we are unable to see any reason why appellants should be forced to sustain damages without compensation for the material loss and destruction of their stock when caused by the use of the "official dip," any more than they would be compelled to sustain such damages where the dip used was not the "official dip." The result to appellants would be the same in either case. We do not mean to be understood as holding that mere inconsequential or slight injuries caused to stock by reason of the dip used would be sufficient reason on the part of appellants for refusing to dip their stock—such injuries and effects as would naturally and ordinarily follow from such dipping—but where any considerable number of stock would be seriously damaged as claimed by appellants in their petition in this case, and others of their stock actually killed because of the very character and poisonous substances in the dip itself, and not by reason of the manner in which the dip was applied, then we think that no citizen should be forced to use such character of material and thereby sustain inevitable and considerable damages in consequence of a compliance with the law, in the absence of any provision for compensation. Therefore we think that as to this count of the petition the trial court was in error in sustaining the general demurrer, but should have heard evidence on the point, and, if satisfied by the evidence that the dip ordered to be used by appellants would cause the death of any considerable number of their stock, or serious and considerable injuries to them, as claimed by appellants, and that this result would arise from the very character and nature of the material ordered to be used, and not from the manner of applying it, then the injunction should have been granted.

[8] There are other contentions made by appellants here, but we will not mention them specifically. It will suffice to say that none of them show error on the part of the

trial court in sustaining the general demurrer, for the reason that a court of equity, under the practice of this state, will not interfere by injunction merely to prevent a criminal prosecution. An exception to the rule, however, is that a court of equity may enjoin a threatened criminal prosecution under a void law, where it is shown that the destruction and injury of property of the citizen will also result. City of Austin v. Cemetery Association, 87 Tex. 331, 28 S. W. 528, 47 Am. St. Rep. 114; Trewitt v. City of Dallas (Tex. Civ. App.) 242 S. W. 1073; Dibrell v. City of Coleman (Tex. Civ. App.) 172 S. W. 552; Goar v. Rosenberg, 53 Tex. Civ. App. 218, 115 S. W. 653; Robinson v. Galveston, 51 Tex. Civ. App. 292, 111 S. W. 1076. In the instant case, however, as to the points now under consideration, it will suffice to say that if such contentions on the part of appellants be sound, they would have a complete defense to any criminal prosecution that might be commenced, and, therefore, in the absence of any showing by their petition, as to these contentions, that their property would be destroyed or the enjoyment of its use be impaired by such criminal prosecution, they are not, under the authorities cited, entitled to injunctive relief, and as to these matters the trial court was not in error in sustaining the general demurrer.

For the error of the trial court in sustaining the general demurrer as to the count of the petition which we have discussed above, the judgment will be reversed, and the cause remanded. It has been so ordered.