OFFICE OF
THE ATTORNEY GENERAL
GERALD C. MANN
ATTORNEY GENERAL

Honorable W. R. Chambers, Chairman
Agricultural Committee
House of Representatives
Austin, T E X A S

Dear Sir:

Opinion No. O-3106
Re: Constitutionality of House Bill
No. 136, Forty-Seventh Legis-
lature.

We acknowledge receipt of your request for our
opinion upon the constitutionality of House Bill No. 136,
now before your Committee. The copy of the Bill accompany-
ing your request is as follows:

"HOUSE BILL NO. 136

"AN ACT

"To promote, encourage, increase and stimulate
the use and sale of rice; to promote the prosperity
and welfare of the rice growers and producers in
the State of Texas through the conducting of a
publicity, sales promotion and development campaign;
to conduct research in and develop new uses for
rice and rice products; to levy and impose a tax
or assessment on rice milled in the State of Texas,
and to provide for the collection thereof to
create a rice development fund; to create a rice
development commission to administer and to con-
trol the rice development campaign, and to pro-
vide the powers, duties and authority and to de-
fine the terms of office of said commission; to
provide when and how said levy or tax shall be
paid and collected; to provide penalties for the
violation of this Act; to provide for cooperation
and joint action in said development campaign
with officers, boards, commissions, departments
or other authorities created or which may be

created in the States of Louisiana and Arkansas upon which similar powers, duties and purposes have been or may be conferred; to repeal all laws or parts of laws in conflict herewith; fixing the effective date of the Act; and declaring an emergency.

"BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

## "RICE DEVELOPMENT COMMISSION — SHORT TITLE

"Section 1. That this shall be known and cited as the 'Rice Development Commission Law,' which shall be added as Chapter 12, Article 165-5 to Title 4 of the Revised Civil Statutes of Texas.

"Section 2. That there is hereby created a Rice Development Commission for the State of Texas, which shall be composed of five persons, not less than three of whom shall be rice growers and two of whom may be rice millers, to be appointed for two year terms by the Governor of this State, with the advice and consent of the Senate. In appointing the Commission, consideration shall be given to recommendations of persons engaged in the rice industry, and no person shall be appointed to membership on the Commission who is not directly interested in either the growing or milling of rice.

## "DEFINITION OF TERMS

"Section 3. That the terms used in this Act shall be defined as follows:

"The term 'milled rice' means rice which has been hulled and from which the germ and all or a part of the bran has been removed, and may be either whole or broken, coated or uncoated. The term will also include 'brown rice' which means rice that has been hulled and from which the germ and bran has not been removed.

"The term 'grower' or 'rice grower' shall mean and include only those who are actually engaged in growing and producing rice and who shall not be engaged either directly or indirectly

or have any connection with the milling of rice, except as members of a grower cooperative association.

"The term 'rice miller' shall mean and include all persons, firms, and corporations who shall mill rice within the State of Texas.

## "CREATION, COLLECTION AND USE OF FUND

"Section 4. That there is hereby assessed a tax of two cents per hundred pounds on all milled rice which is milled in the State of Texas on and after the first day of August after the Legislature of Louisiana and Arkansas shall have adopted a statute similar to this statute, assessing a tax of not less than two cents per hundred pounds on milled rice in said States and creating similar commissions, boards, departments or other authorities in said States having similar powers and purposes, or vesting such powers and purposes in officers, commissions, boards, departments or other authorities already created in such States.

"Section 5. That said tax shall be paid by all rice millers in the State of Texas on all rice milled in the State of Texas and shall be payable within the first ten days of each month for all rice milled during the preceding calendar month, which tax shall be remitted direct to the Rice Development Commission hereby created. Any rice miller failing to pay said tax within the time specified and as herein required shall pay a penalty of ten per cent of the amount due, plus one per cent per month for each and every month in which said tax is not paid.

"Section 6. That the Rice Development Commission hereby created shall have authority to check and examine the books and records of all rice millers at all reasonable times during business hours, and take copies of the same, in order that it may collect the full amount of the tax hereunder, and shall have

power to file any suit or suits or take any other actions necessary to force collection or payment of the same. The said Commission is authorized to make such regulations as may be necessary to carry out the powers vested in it by this Act. Any person required to keep any records or supply any information for the purposes of the computation of the amounts due under this Act, who wilfully fails to keep such records or supply such information shall be guilty of a misdemeanor and upon conviction thereof be fined not more than $500, or imprisoned for more than six months, or both, together with the costs of prosecution.

"Section 7. That the Rice Development Commission hereby created shall have full authority to spend said funds so collected in the administration of this Act and in the promotion of sales of rice and rice products, and for research in and development of new uses for rice and rice products, and shall cooperate and act jointly with commissions, boards, departments or other authorities having similar powers and purposes, created or which may be created by statutes of the States of Louisiana and Arkansas, and said money may be expended in a joint effort by the three state commissions, boards, departments or authorities. Accurate books and records shall be maintained at all times, reflecting the operations of the Commission, and such books and records shall be available for public audit and inspection.

"Section 8. That said Commission shall serve without pay except the members thereof shall receive ten dollars per day for every day actually expended in connection with their duties, as provided for and authorized by this Act, plus actual expenses incurred by them in connection with such duties.

"ORGANIZATION AND AUTHORITY

"Section 9. That the said Commission shall elect from among its members a chairman, a vice-chairman, a secretary, and a treasurer; any two

of which offices, except that of chairman, may
be held by one person. The Commission shall
have authority to select a manager and all other
persons necessary to carry out and administer
this Act, in connection with the Louisiana and
Arkansas Commissions, boards, departments or
other authorities, which manager and other per-
sons shall receive such salary or compensation
as the Commission may fix, plus such expenses as
they may actually incur, out of funds collected in
the administration of this Act.

"Section 10. That the said Commission shall
have authority to prescribe forms upon which rice
millers shall be required to make monthly returns
of the rice milled and sold by them, and the
manner in which such returns shall be made.

"Section 11. That this Act shall become
effective on the first day of August after the
Legislature of Louisiana and Arkansas shall
have adopted a similar Statute, assessing a
tax of not less than two cents per hundred pounds
of milled rice in said States, and creating
similar Commission, Boards, Departments, or
other Authorities with similar powers and
purposes. The provisions of this Section and
of Section 4 and Section 7, or any other
Section or part of this Act in which the
validity of such Act depends upon, or is con-
nected with similar action by the Legislature
of Louisiana and Arkansas, shall be satisfied
by the creation and vesting of such authority
in any State Officer, Board, Commission, De-
partment, or other Authority in the States of
Louisiana and Arkansas, providing the same
powers are delegated to such Officer, Board,
Commission, Department or other Authority,
and providing that a tax is levied of not
less than the amount levied herein for such
purposes.

"Section 12. That the creation of a Rice
Development Commission for the State of Louis-
iana, levying the same tax as herein levied in
this State, for the same powers and purposes,
and vesting the authority of the Rice Develop-

ment Commission for Louisiana, under Act No. 112 of the 1940 Legislature, in the Department and Director of the Department of Agriculture, the Department and Director of the Department of Finance and the Department and Director of the Department of Revenue for the State of Louisiana created by Act No. 47 and Act No. 48 of the 1940 Legislature, is within the terms of this Act, so that this Act shall become effective on the first day of August after the Legislature of Arkansas shall have adopted a statute similar in purpose to this Act, or to Act No. 112 of the 1940 Legislature of the State of Louisiana and levied a tax of not less than two cents per hundred pounds of milled rice for similar purposes.

"Section 13. That all laws or parts of laws inconsistent or in conflict with the provisions of this Act are hereby repealed.

"Section 14. The fact that present world conditions have caused a loss of certain foreign markets for rice, and that the rice farmers of Texas are in need of establishing more and better markets for rice and of advertising to the people of the United States the value of rice as a food and its use in food products, and the urgent need that an advertising and development program be immediately sponsored for the rice growers of Texas; and the fact that this Act and the Acts of Louisiana and Arkansas shall not become effective until similar acts are passed by all three states, which Act has already been passed by the State of Louisiana, and the Legislature of the State of Arkansas now being in session or about to convene, creates an emergency and an imperative public necessity that the Constitutional Rule requiring Bills to be read on three separate days be, and the same is hereby suspended, and this Act shall take effect and shall be in force on the dates provided for herein after the date of its enactment, and it is so enacted."

At the outset of our consideration of your request we are confronted with the question of whether the tax and the

appropriation of the revenues derived therefrom are for a "public purpose" as required by the Constitution of this State.

Article VIII, Section 3 of the Texas Constitution reads as follows:

"Taxes shall be levied and collected by general laws and for public purposes only."

Article XVI, Section 6 of the Constitution provides:

"No appropriation for private or individual purposes shall be made. . . ."

Substantially the same factors must be considered in applying each of the foregoing constitutional limitations and we will therefore discuss them together. We also note here that the portion of the bill levying the tax, and that designating the purposes for which the revenues therefrom may be expended are so closely related and inseparably tied together that they cannot be separated so that one might stand and the other fall. San Antonio Independent School District v. State, 173 S. W. 525; 39 Tex. Jur., p. 22 8 9 and cases there cited. This same principle is applicable to Section 7 of the Bill providing the several purposes for which the moneys may be expended. It would hardly be possible to say that if one of the uses enumerated should be other than a public purpose, the Legislature would nevertheless enact the Bill with the same revenues to be used for more restricted purposes. We shall therefore confine our consideration to the levy of the tax for the purpose of "promotion of sales of rice and rice products." The title and emergency clause of the Bill leaves no doubt but that by this, it is intended to finance and conduct a publicity and advertising campaign to promote and increase the sale of rice and its products. It must therefore be determined whether this is a public purpose as that term is employed in the Constitution of Texas.

What constitutes a public purpose or use, as distinguished from a private purpose, for which taxes may be levied and public funds expended, has been repeatedly before the courts of practically every state in the Union and the Supreme Court of the United States. But no court has undertaken to lay down with minute detail an inexorable rule that would distinguish the one from the other. Obviously, no such rule could be laid down, for it is a flexible concept which must be considered with reference to the facts,

circumstances, and purposes in each particular case and which may expand and contract with the necessities and complexities of life in the democratic state. The decisions of the courts have not been uniform on this subject and it must be recognized that the modern trend of decision is to give a more liberal construction to the term "public purpose" or "use", however, this tendency is not without its limitations.

The rule announced in Neal v. Boog-Scott (T.C.A.) 1923), 247 S. W. 689, has long been recognized by practically every court in the United States. In that case it is stated:

"The question as to whether an act of the Legislature of this state will serve a public use or purpose is, in the first instance, a question for the determination of the Legislature, and that determination or decision cannot be reviewed and the contrary determined by the judiciary except in instances where the legislative determination of the question is palpably and manifestly arbitrary and incorrect.

" . . .

"Again the learned author (Judge Cooley in Constitution Lim.), at pages 128, 129, says:

"'The Legislature is to make laws for the public good and not for the benefits of individuals. It has control of the public moneys, and should provide for disbursing them for public purposes only. Taxes should only be levied for those purposes which properly constitute a public burden. But what is for a public good, and what are public purposes, and what does properly constitute a public burden, are questions which the Legislature must decide upon its own judgment, and in respect to which it is vested with a large discretion which cannot be controlled by the courts, except perhaps where its action is clearly evasive, and where, under pretense of a lawful authority, it has

assumed to exercise one that is unlawful.'"

Judge Cooley in his work on Taxation, 4th Edition, Volume 1, Section 189, in commenting upon this doctrine of non-interference by the judiciary, said:

"These are very strong and sweeping assertions, but they are supported by many others equally emphatic and comprehensive, which are to be met with in the adjudications of courts. The very emphasis, however, with which the principle is declared renders it peculiarly liable to mislead, unless it is examined in the light of the adjudicated cases in which it has been applied, generally with explanations, and often with necessary qualifications."

There were numerous early cases in which cities or political subdivisions of the state were authorized by statute to levy taxes or use public funds to induce or encourage industrial or manufacturing concerns to locate in such subdivision or by granting financial aid or bounties to such enterprises. The courts almost without exception held such purposes to be private rather than public. In Savings & Loan v. Topeka City, 87 U. S. 686, 22 Fed. 455 the Supreme Court of the United States in holding invalid bonds issued by a city to aid and encourage a company in establishing and operating bridge shops in the city, held the purpose to be private and in so doing stated:

". . . This power (taxation) can as readily be employed against one class of individuals and in favor of another, so as to ruin the one class and give unlimited wealth and prosperity to the other, if there is no implied limitation of the uses for which the power may be exercised.

"To lay, with one hand, the power of the government on the property of the citizens, and with the other to bestow it upon favored individuals to aid private enterprises and build up private fortune, is none the less a robbery because it is done with the forms of law and is called taxation. This is not legislation. It is a decree under legislative forms:

" . . .

"It is undoubtedly the duty of the
Legislature which imposes or authorizes munici-
palities to impose a tax, to see that it is not
to be used for purposes of private interest
instead of a public use, and the courts can
only be justified in interposing when a
violation of this principle is clear and
the reason for interference cogent. And in
deciding whether, in a given case, the object
for which the taxes are assessed falls upon
the one side or the other of this line,
they must be governed mainly by the course
and usage of the government, the objects
for which taxes have been customarily and
by long course of legislation levied, what
objects or purposes have been considered
necessary to the support and for the proper
use of the government, whether State or
municipal. Whatever lawfully pertains to
this and is sanctioned by time and the
acquiescence of the people and may well
be held to belong to the public use, and
proper for the maintenance of good govern-
ment, though this may not be the only
criterion of rightful taxation.

"But in the case before us, in which the
towns are authorized to contribute aid by way
of taxation to any class of manufacturers, there
is no difficulty in holding that this is not
such a public purpose as we have been con-
sidering. If it be said that a benefit re-
sults to the local public of a town by
establishing manufacturers, the same may be
said of any other business or pursuit which
employs capital or labor. The merchant,
the mechanic, the inn-keeper, the banker, the
builder, the steamboat owner are equally
promoters of the public good, and equally
deserving the aid of the citizens by forced
contributions. No line can be drawn in
favor of the manufacturer which would not
open the coffers of the public treasury to
the importunities of two thirds of the
business men of the city or town."

For a further citation and digest of authorities to the same effect, see Annotation 112 A.L.R. 571, where the following conclusion is drawn by the annotator:

"The decisions apparently are agreed on the general rule that encouragement or promotion of a specific industrial enterprise carried on by a private owner is not a public purpose for which taxes may be imposed or public money appropriated.

" . . .

"The comparatively few cases taking the view that the encouragement or promotion of an industry as a whole is a public purpose for which the taxing power may be validly exercised all relate to statutes passed in aid of agriculture."

In Michigan Sugar Co. v. Auditor General, (Sup. Ct. Mich. 1900) 124 Mich. 674, 83 N.W. 625, the statute under review provided a bounty to be paid for the manufacture in Michigan, of sugar from sugar beets grown in the State of Michigan, and among other things required the manufacturer to pay the seller of the beets a certain minimum price in order to be eligible for the bounty. The court held the bounty to be for a private and not a public purpose. A similar statute was before the Minnesota Supreme Court in Minnesota Sugar Co. v. Iverson, (1903) 91 Minn. 30, 97 N.W. 454, and the act was held to be void, the purpose of the act being private. The court stated in its opinion:

" . . . That a manufacturing company is not a public enterprise, within the meaning of any well-settled rule, and that a gratuity or bounty thereto is not a grant of money other than for a private purpose, is universally held in the courts of the United States. It is upon this principal that the case we have cited from our own Reports are based. The raising of sugar beets for manufacture in this state is just as much a private business enterprise as is the manufacture of sugar therefrom, or the carrying on of any other kind of a manufacturing business. . . . It is also universally held that, to sanction a grant of public funds, the public purpose involved must be direct."

In Deal v. Mississippi County (Sup. Ct. Mo. 1891) a statute "to encourage growth of forest trees," provided a per acre bounty for planting and cultivating "forest trees" on prairie land. The court held the act in violation of a constitutional provision requiring that taxes be levied and collected for public purposes only. The court pointed out that the land was the private property of the owner and stated:

> "That an enterprise may indirectly inure to the public benefit is not the sole criterion by which to determine a public purpose. Every improvement and every business enterprise benefits the public to some extent. . . . The legislature of Missouri had no power to authorize county courts to raise money by taxation, to be appropriated to the planting of trees upon private property for private gain, no right to the trees or the use or control of the trees being reserved to the public."

The various jurisdictions are in conflict upon the question of using public money to aid farmers by making seed loans. In State ex rel Griffith v. Osawkee Twp., 14 Kan. 418, 19 Am. Rep. 99, it was held that such use was not a public purpose but in State ex rel Goodwin v. Nelson County, 1 N. D. 88, 45 N. W. 33, such grants were held to be for a public purpose on the basis that the recipients were in imminent danger of becoming paupers. The real public purpose was therefore, care of paupers and indigents. William Diering & Co. v. Peterson, (Sup. Minn. 1898), 77 N. W. 568, held an act appropriating money for seed loans to farmers whose crops were destroyed by hail or storms, to be for a private purpose, but intimated that if the appropriation had been limited to these in imminent danger of becoming paupers it might have been upheld.

Acts in the various states providing for county agents, research, and the promotion of the science and art of agriculture in cooperation with the Federal Government have generally been upheld. This is also true of farm bureau laws. Carmen v. Hickman County (Ky. 1919) 215 S. W. 408; Hendrickson v. Taylor County Farm Bureau (Ky. 1922), 244 S. W. 82; State ex rel Hall County Farm Bureau v. Miller (Neb. 1920), 178 S. W. 846; Westlake v. Anderson (N.D.) 156 N. W. 925; Norcross v. Cale (Nev.) 189 Pac. 877; Comer v. State, (Ind.) 110 N. E. 984. These cases have gone on the basis that the funds were devoted to a branch of the educational policy of the state affecting its chief industry, and that

the development and promotion of the general agricultural
interests of the state are matters of public interest and
affect the public generally.

In Vette v. Childers (1924), 228 P. 145, the
Supreme Court of Oklahoma held unconstitutional an act
providing financial aid for the establishment of ware-
houses by "farmer's cooperative associations" and in so
doing stated:

> ". . . When we consider Sections 14 and
> 19, Article 10, together, it is apparent that
> taxes can be levied in this state only for
> public purposes, and funds in the state
> treasury which have been raised by taxes
> for public purposes cannot be devoted to
> any other purpose.
>
> ". . .
>
> "The appropriation provided in Section
> 18 of the act under consideration is not for
> purposes of regulation and control of the
> enterprise, but is to assist in establishing
> a system of warehouses to be owned, operated
> and controlled by associations of individuals.
> While the establishment and operation of the
> system of warehouses might ultimately
> result in a benefit to the entire farming
> class of the state, and by reason of the
> encouragement given to this industry might
> result in a general benefit to the entire
> public, the direct object of this appro-
> priation is for the assistance of a group of
> individuals who shall own, operate, and
> control the warehouses.
>
> ". . . While the learned trial judge
> was of the opinion that the act was for the
> benefit of the farmer, and thus benefited the
> public, and the appropriation was for that
> reason for a public purpose, we are of the
> opinion that the associations of individuals
> to whom the fund is to be loaned are the
> ones directly benefited by the act, and
> with only a prospective and indirect bene-
> fit to the public."

We do not consider cases such as Doggett v. Colgan, (Calif. Sup. 1891) 14 L.R.A. 474; Kentucky Live Stock Breeder's Ass'n v. Hager (Ky. 1905) 85 S.W. 738, and others holding that the conduct of a state fair, or placing exhibits advertising the State generally in expositions outside the state, and for the benefit of the state as a whole, are applicable to the Bill here under consideration.

The Texas cases upon this subject are not numerous.

It was held in Weaver v. Scurry County (T.C.A. 1894) 28 S.W. 836 that an act providing for the payment of a bounty for destroying wolves and other wild animals was for a public purpose, based upon Section 23, Article 16 of the Constitution providing that "the legislature may pass laws for the protection of stock raisers in the stock raising portions of the state." This case was cited with approval in Neal v. Doog-Scott, (T.C.A. 1923) 247 S.W. 689, holding that the tick eradication law did not violate Article 8, Section 3. The court there held the act was for a public purpose on the grounds of public health and protection of stock and stock raisers.

These cases are of little benefit in determining the issues here since they are clealy justified and are based upon the grounds mentioned above.

In Davis v. City of Taylor, (Sup. Ct. 1934), 67 S.W. (2d) 1033, an ordinance, levying a tax for "the establishment and maintenance of a Board of City Development, Chamber of Commerce, or other similar organization under whatsoever name, devoted to the growth, advertisement, development, improvement, and increase of the taxable values of the city of Taylor, was upheld against the attack that it was not for a public purpose. The court cited and discussed the cases in other jurisdictions holding that appropriations for exhibiting the resources of a locality at state or national exhibitions or fairs, were for a public purpose, and drew the following conclusion:

> ". . . We can see no material difference in the ultimate purpose of an exhibit of the resources of a particular locality at an exposition and the more modern method of presenting the advantages and opportunities of a city, county, or state, through newspapers or magazines advertising, and similar channels.

". . . The central and leading purpose,
and the controlling one, is whether or not
a municipality may use city funds to advertise
the city's advantages."

It must be noted that this case is based upon
advertising the advantages and opportunities of the city
and its resources. In our opinion there is a marked dis-
tinction between such advertising and the situation which
would have been before the court had the city attempted to
levy a tax to advertise the products of some industry
located within its limits, as for example, the mattress
industry. Advertising within itself is but the means and
not the end.

The Thirty-third Legislature enacted what was known
as the Presidential Primary Act and, among other things,
it was provided that the expense of primary elections for
parties whose candidate for Governor at the last preceding
general election received as many as 50,000 votes should be
paid out of the county treasury of each county. The Supreme
Court of Texas, speaking through Chief Justice Phillips,
held such expenditure not to be for a public purpose in
Waples v. Marrast, (1916), 184 S.W. 180. In the opinion,
the court discussed the meaning of "public purpose", as
used in our constitution, quite fully and we therefore
quote at some length the expressions of the court:

"Taxes are burdens imposed for the
support of the government. They are laid as
a means of providing public revenues for
public purposes. The sovereign power of the
State may be exercised in their levy and col-
lection only upon the condition that they
shall be devoted to such purposes; and no
lawful tax can be laid for a different pur-
pose. Whenever they are imposed for pri-
vate purposes, as was said in Brodhead v.
Milwaukee, 19 Wis. 670, 88 Am. Dec. 711, it
ceases to be taxation and becomes plunder.

"It is not easy to state in exact terms
what is 'a public purpose' in the sense in
which that term is employed as a limitation
upon the State's power of taxation. The
framers of the Constitution were doubtless
sensible of this difficulty, for they did not
attempt to define it. Many objects may be

public in the general sense that their attainment will confer a public benefit or promote the public convenience, but not be public in the sense that the taxing power of the State may be used to accomplish them. The powers of the State as a sovereignty exist only for governmental purposes. They may be freely exerted in the discharge of all the governmental functions of the State; but cannot be applied to uses, though public in aim and result, which are not governmental in their nature. As the means provided for the support of the government in its administrative duties and existing alone for that end, the taxing power may be employed for no purpose save that which in a true and just sense is related to the performance by the State of its governmental office. The appropriation of the public revenue is a legislative power, and the Legislature must necessarily be allowed a large discretion in determining to what uses public moneys may be put. Subject to the constitutional limitation that the public revenue shall be applied to only public purposes, to the prudent husbandry of the Legislature as well as its provident foresight has been committed the public trust of making such use of it as will afford the economical administration of the government which both the spirit and the letter of the Constitution enjoin. The term 'public purpose' as used in this relation is not, therefore, to be construed narrowly, so as to deny authority to the Legislature to make such provision for the administration and support of the government in its several branches and subdivisions as will faithfully subserve the present and future interest of the people. The limitation imposed by the Constitution upon the power is, however, imperative. And it is essentially true that it does not permit taxation for all purposes which in a broad and general sense may be regarded as public, but expressly confines its exercise to only those public purposes with which the State, as a government, invested with high and sovereign powers, but only as a grant from the people and therefore to be solely used for the common benefit of

all of them, and not as a paternal institution, may justly concern itself, and to which, for that reason, the public revenues may be rightfully devoted.

"As to what is a public purpose within the meaning of Section 3, Article 8 of the Constitution, no better test can be presented than the inquiry:  Is the thing to be furthered by the appropriation of the public revenue something which it is the duty of the State, as a government, to provide?  Loan Association v. Topeka, 20 Wall. 655, 22 L. Ed. 455; People v. Town of Salem, 20 Mich. 452, 4 Am. Rep. 400.  Those things which it is the duty of the State to provide for the people, it is equally the right of the State, by means of the public revenue, to maintain. Within this category fall the general instrumentalities of the government, the public schools, and other institutions of like nature. But the state is wholly without any power to levy and appropriate taxes for the support of those things which, either by common usage or because they are in no proper sense the instruments of government, it is the duty of the people to provide for themselves.  It is not all things which answer a public need or fill a public want that it is within the authority of the State to furnish for the people's use or support at the public expense.  Manufacturing industries, railroads, public enterprises of many kinds, private schools and private charitable institutions all afford a service to the public, but the State is without any power to maintain them.  Religion is generally esteemed a helpful influence for public morality.  But the Constitution expressly declares that no public money shall be granted in aid of any religious organization."

Referring back to the provisions of the Bill in question, it must be recognized that merely because the tax is laid on the rice industry and then expended for its benefit is not significant.  If the purpose is public in character, the appropriation might be made from the general revenue fund of the State, or the tax laid upon other occupations such as

the milling of flour, production of oil, etc., and the revenues dedicated to advertising rice and rice products. Or, on the other hand the tax levied in this Bill on rice millers, might be used to advertise corn and wheat and their products, if that purpose be public.

It is quite clear that the Texas courts have never gone so far as to hold a purpose of this nature to be public. The language in Waples v. Marrast has never been expressly disproved by our Supreme Court and its construction of our constitutional provisions would be a sufficient basis for holding the Bill under consideration unconstitutional.

We think that under the better reasoned authorities and the sounder principles upon which the above quoted constitutional limitations are based, advertising and conducting a sales and publicity campaign for rice and rice products, "to promote the prosperity and welfare of rice growers and producers in the State of Texas," as stated in the Act, is not a public purpose for which taxes may be levied and public moneys appropriated. The Act therefore in our opinion violates Article VIII, Sections 3 and 6 of the Texas Constitution. There are two recent cases, however, to which we wish to direct attention.

In Floyd Fruit Co. v. Florida Citrus Commission, (1937), 175 So. 248, 112 A.L.R. 562, the Florida Supreme Court upheld an act very similar to House Bill No. 136. The statute levied an excise tax on the basis of 1¢ per box on oranges, 3¢ per box on grapefruit, and 5¢ per box on tangerines to be placed in a special fund for the purpose of advertising these various products. In the course of the opinion the court held that advertising the citrus industry of Florida was for a public purpose for which taxes might be levied. The court apparently takes the position that the citrus industry is one of the state's greatest industries and affects so great a portion of the population of the state as to be a matter of public concern, and therefore its advertising is a public purpose. At another point in the opinion the court states:

> "It is not exclusively for their (those engaged in turning citrus fruit into the channels of commerce) benefit because any activity which redounds to the benefit of those engaged in marketing citrus fruits in Florida redounds indirectly, to some extent, to benefit the public generally." (Underscoring ours.)

This case was followed by the Supreme Court of Idaho in State ex rel Graham v. Enking (1938), 82 Pac. (2d) 649, by a divided court, three to two. The statute was almost identical with the Florida Act except that it applied to "fruits and vegetables and by-products," and defined fruits and vegetables as apples, prunes, potatoes and onions. The court quoted at length from the Florida case and stated that "the protection and promotion of the apple, prune, potato, and onion industry is as much a matter of concern to Idaho as the citrus fruit industry is to Florida," and concluded that therefore the tax was for a public purpose.

It may be argued at great length as to whether these cases may be distinguished from the situation now before us, and whether their doctrines and holdings would be accepted and applied by the courts of this State should the question be presented to them. As heretofore pointed out, time and usage is an element to be considered in determining questions of this nature, and under the present status of the Texas decisions, this is a matter which must necessarily be purely speculative and upon which we are not competent to advise.

We next refer to that portion of the Bill which levies the tax and directs that all the proceeds therefrom shall be used by the Commission to effectuate the purposes therein enumerated.

Article VIII, Section 1 of the Texas Constitution provides in part:

"Taxation shall be equal and uniform. All property in this State, whether owned by natural persons or corporations, other than municipal, shall be taxed in proportion to its value, which shall ascertain as may be provided by law. The Legislature may impose a poll tax. It may also impose occupation taxes, both upon natural persons and upon corporations, other than municipal, doing any business in this State. It may also tax incomes of both natural persons and corporations other than municipal, except that persons engaged in mechanical and agricultural pursuits shall never be required to pay an occupation tax. . . ."

Article VIII, Section 2 of the Texas Constitution contains the following provision:

"All occupation taxes shall be equal and
uniform upon the same class of subjects within
the limits of the authority levying the tax;
. . ."

Article VII, Section 3 of the Constitution reads
in part as follows:

"One-fourth of the revenue derived from
the State occupation taxes and poll tax of
one dollar on every inhabitant of the State,
. . . shall be set apart annually for the
benefit of the public free schools."

Certain language in House Bill No. 136 is such that
it may be susceptible to the construction that a property
tax is intended to be imposed, however, upon closer exami-
nation it becomes apparent that this is not a proper char-
acterization of the tax.

Taxes fall into three general classes, namely, capi-
tation or poll taxes, taxes on property, and excises. Taxes
on property are sometimes described as those which are direct-
ly upon the property itself. The term excise has come to
have a broad meaning and includes every form of taxation
which is not a burden laid directly upon persons or property;
in other words, excise includes every form of charge imposed
by public authority for the purpose of raising revenues upon
the performance of an act, the enjoyment of a privilege,
or the engaging in an occupation. The obligation to pay an
excise is based upon the voluntary action of the person taxed
in performing the act, enjoying the privilege, or engaging
in the occupation which is the subject of the excise and the
element of absolute and unavoidable demand is lacking. 26
R.C.L. p. 34 § 18. Excises may fall ultimately upon property
indirectly and be paid out of it but if the tax is really im-
posed upon the performance of an act, the enjoyment of a privi-
lege, or the engaging in an occupation, it will be considered
an excise.

To construe the tax imposed by House Bill No. 136
as a property tax would render it in violation of Article
VIII, Section 1, for it would not be on all property alike,
and not in proportion to its value, even as to milled rice.
It might also be noted here that Article VIII, Section 9,
limits the State ad valorem tax rate to 35¢ per $100.00
valuation on property. These factors being true it will
not be construed as a property tax if there is a reasonable
basis for another classification.

The fact that some of the language in the act might
suggest a purpose to lay the tax upon the rice is not con-
trolling, for an express classification of a tax in the
taxing statute is not conclusive or of great significance.

City of Abilene v. Fryar (T.C.A. 1940), 143 S. W. (2d) 654;
State v. City of El Paso (Sup. Ct., 1940) 143 S. W. (2d) 366;
State v. Hogg (Com. App. 1934), 72 S. W. (2d) 593.

Floyd Fruit Co. v. Florida Citrus Commission, 175 So. 248, 112 A.L.R. 562, recognized a similar tax as an excise tax in the following language:

> "So it is that under the provisions of the act, it is defined as an excise tax. It is levied on the basis of 1 cent per box on oranges, 3 cents per box on grapefruit, and 5 cents per box on tangerines per standard packed box. The tax is payable when the fruit is first delivered into the primary channel of trade. It is to be paid by the handler of such fruit at that time and not before. The primary channel of trade may be by sale, delivery for shipment, or delivery for canning or for processing into by-products. It is a tax upon the privilege of handling fruit for shipping, or delivering fruit for canning or processing into by-products. The tax is not levied upon the right of ownership or of production, or of possession."

Some courts have used the terms "excise" and "occupation tax" as practically interchangeable terms but our courts have clearly recognized the distinction. It is very forceably pointed out in City of El Paso v. State, (T.C.A. 1940) 135 S. W. (2d) 763, and State v. City of El Paso (Sup. Ct. 1940) 143 S. W. (2d) 366, reversing the former case, that an occupation tax is a subclassification of the broader term "excise tax" and that the constitutional provision exempting cities from occupation taxes does not extend to other types of excises. The Supreme Court held in that case that the gasoline tax was an excise based upon the "use" and could not be classified as an occupation tax and within the constitutional exemption.

In this case it does not appear that the miller is made in fact a mere collecting agency for the State. The rice miller is required to make monthly reports showing the amount of rice milled by him during the preceding month and is required to pay the tax on all rice milled during the month within the first ten days of the succeeding calendar month, and upon his failure so to do,

penalties and interest accrue. The tax does not accrue unless and until the rice is milled and it attaches at that time without reference to sales, use or the happening of subsequent events. The tax is based upon a per unit of business or milling done, (2½ per 100 pounds of rice milled) which is an acceptable measure for the state to use in levying an occupation tax. Grayburg Oil Co. v. State, (Com.App. 1928), 3 S.W. (2d) 427. It is not a license fee or tax for it is clearly to raise revenue and not for the purpose of regulation. Hurt v. Cooper, 110 S.W. (2d) 896.

It is our opinion that the tax imposed by House Bill No. 136 is an occupation tax and Article VIII, Section 3 of the Texas Constitution therefore requires that one-fourth of the revenue derived therefrom shall be set apart for the benefit of the public free schools.

Article VIII, Section 6 of the Texas Constitution reads in part as follows:

"No money shall be drawn from the Treasury but in pursuance of specific appropriations made by law; nor shall any appropriation of money be made for a larger term than two years, . . ."

Article III, Section 44 of the Constitution contains the following provision:

"The Legislature shall provide by law for the compensation of all officers, servants, agents and public contractors, not provided for in this Constitution, . . ."

Section 5 of the Act provides that the tax shall be remitted directly to the Rice Development Commission, created by the Act, and no provision is made for the deposit of such public money with the State Treasurer. We think it is proper to point out that this does not place such funds beyond the provision of Article VIII, Section 6. McCombs v. Dallas County, (T.C.A.1940), 136 S.W. (2d) 975; affirmed Dallas County v. McCombs, (Sup. Ct. 1940), 140 S.W. (2d) 1109.

Other constitutional provisions may affect the imposition or collection of the tax when attempted to be applied

to various individuals but we do not consider it necessary to discuss such provisions here.

As heretofore stated it is our opinion that House Bill No. 136 contravenes Article VIII, Section 3 and Article XVI, Section 6 of the Texas Constitution in that the tax and expenditures therein provided are not for a "public purpose."

We are further of the opinion that the tax provided in the Bill is an occupation tax and therefore one-fourth of the revenues derrived therefrom must be set apart annually for the benefit of the public free schools as required by Article VII, Section 3, of the Texas Constitution.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By Signed: Cecil C. Cammack
Cecil C. Cammack
Assistant

CCC:eaw

APPROVED FEB 28, 1941

Signed: Geral C. Mann

ATTORNEY GENERAL OF TEXAS