**R. J. NUNLEY, Appellant,**

v.

**TEXAS ANIMAL HEALTH COMMISSION, Appellee.**

**No. 14912.**

Court of Civil Appeals of Texas, San Antonio.

July 30, 1971.

Rehearing Denied Sept. 28, 1971.

Atlas, Hall, Schwarz, Mills, Gurwitz & Bland, Morris Atlas, Gary Gurwitz, McAllen, for appellant.

Crawford C. Martin, Atty. Gen., Nola White, Alfred Walker, J. C. Davis, Malcolm L. Quick, James C. McCoy, Asst. Attys. Gen., Austin, for appellee.

CADENA, Justice.

Plaintiff, R. J. Nunley, seeks to enjoin defendant, Texas Animal Health Commission, from enforcing against him the provisions of Section 23A of Article 1525b, Vernon's Ann.Tex.Pen.Code, and the rules and regulations adopted under the authority granted by such statute.[1] The statute, rules and regulations are aimed at the control and eradication of bovine brucellosis.

This suit was filed after the Commission had ordered plaintiff's herd quarantined and had ordered the destruction of ten animals in such herd. In its answer, the Commission asked that plaintiff be ordered to submit his herd for retesting for the presence of brucellosis. Plaintiff appeals from the judgment of the trial court which, although it declared the quarantine order to be void, ordered plaintiff to present his herd for retesting.

Plaintiff owns a herd of cattle in McMullen County, a county which has been designated as a Type II brucellosis control area under the provisions of Sec. 23A(4) of Article 1525b. In a Type II area, the statute directs the Commission to "conduct such tests, vaccinations and other practices, and to enforce such rules and regulations as may be necessary to qualify said county for certification or recertification as a modified certified brucellosis free area as outlined in the uniform regulations of the United States Department of Agriculture" and the Commission. Sec. 23A(9). If the tests reveal the presence of brucellosis, the animals whose positive reaction to the test shows them to be infected (reactors) are branded with the letter "B" on the left jaw. Reactors must be handled in accordance with the rules and regulations of the Commission, "which shall provide for the issuance of quarantines, the manner, method and system of disposing of reactor cattle, the testing and retesting of infected herds, and the cleaning and disinfection of premises following the removal of reactor cattle." Sec. 23A(18). A branded animal must be sold for slaughter within 15 days.[2]

Prior to September 11, 1968, a representative of the Commission directed plaintiff to have his herd available for testing. On September 11, 1968, at the request of plaintiff, Dr. Moffett, a veterinarian engaged in private practice, drew blood from each of the 438 animals in plaintiff's herd and submitted the blood samples to the state laboratory in Laredo, which subjected the samples to the card test for brucellosis. On September 13, 1968, the laboratory informed Dr. Moffett that the test revealed the presence of 17 reactors in plaintiff's herd.

As a result of plaintiff's request that the 17 reactors be retested, on October 10, 1968, the Commission veterinarian in charge of brucellosis testing in McMullen County drew blood samples from the 17 animals which had been designated as reactors following the September test. At plaintiff's request, the state laboratory subjected these blood samples not only to the card test, but also to the other two tests which the Commission recognizes as official tests, the plate test and the tube test, and to a supplemental test, known as the Rivanol test, which is not officially recognized by the Commission.

1. Plaintiff also seeks to enjoin enforcement of Article 1525d of the Penal Code, which makes it a misdemeanor for any person to refuse to permit representatives of the Animal Health Commission to enter upon his premises for the purpose of carrying out some of their duties.

2. Meat from cattle infected with brucellosis may be safely consumed by humans if it is cooked.

According to the card test performed on the blood samples drawn on October 10, 1968, only 10 of the animals designated as reactors following the September test were designated as reactors. When plaintiff was notified of the results of the October test, he asked that he be furnished with copies of the results of the official plate test, the official tube test and the supplemental Rivanol test. He was told that copies of the results of such other three tests were not available, and it was not until some months after this suit was filed that the Commission found and gave plaintiff the results of such other tests. Although the October card test showed the presence of 10 reactors, the plate test showed one reactor, the tube test showed that three animals were infected, and the Rivanol test showed three reactors.

On January 30, 1969, the Commission, by letter, suggested a retest of plaintiff's herd and offered to allow plaintiff to select either the card test or the plate test as determinative. Plaintiff did not reply to this offer because, according to his testimony, at that time his efforts to obtain the results of the tube, plate and Rivanol tests had proved fruitless. On February 11, 1969, the Commission informed plaintiff that his entire herd was quarantined, and that a representative of the Commission would come upon plaintiff's premises on February 25, 1969, for the purpose of branding the 10 animals which the October, 1968, card test identified as reactors. As already noted, this meant that the ten animals had to be sold for slaughter within 15 days after being branded. It is undisputed that the value of these animals, if healthy and used for dairy or breeding purposes, is twice as much as their value if sold for slaughter. Plaintiff then filed this suit.

Plaintiff's first sixteen points of error are "no evidence" and "insufficient evidence" points challenging the trial court's finding that the card test is reliable and accurate to a reasonable degree, and the finding that some of plaintiff's animals are infected with brucellosis.[3]

A veterinarian testifying on plaintiff's behalf stated that the three tests (card, plate and tube) recognized by the Commission are not reliable tests for brucellosis. This witness particularly criticized the card test as a test which "overcondemned." However, his testimony is flatly contradicted by other experts who testified that the card test was accurate and reliable to a reasonable degree, and that a positive reaction to the card test establishes to a reasonable probability that the animal so reacting is infected with brucellosis. The testimony in this case, although conflicting, supports the finding that the card test is reasonably accurate and reliable.

■ If the card test is reasonably reliable and accurate, the results of that test are sufficient to support the finding that there is brucellosis in plaintiff's herd. Despite the disparity between the results of the September card test (which showed the presence of 17 reactors) and the October card test (which showed the presence of only ten reactors among the 17 which had reacted positively to the September card test), and despite the low degree of correlation (which all but one witness described as unusual) among the results of the four tests performed in October, the finding that some of plaintiff's animals are infected with brucellosis cannot be condemned as being contrary to the overwhelming weight and preponderance of the evidence, since all of the four tests showed the presence of brucellosis in the herd.

3. Although plaintiff complains of the fact that the trial court found the plate test and the tube test to be reasonably accurate and reliable, the record shows that the only finding of reliability concerned the card test.

Plaintiff's points 17 and 18 present the contention that the Texas program is unconstitutional because the statute, rules and regulations are not appropriate and reasonable means of accomplishing the control and eradication of brucellosis. The argument is that the program is so oppressive and unreasonable, in the light of the circumstances, that it operates as a deprivation of property without due process of law.

This argument rests on the assumption that the tests relied on by the Commission are not accurate methods of determining the presence of brucellosis. Not only have we already concluded that the evidence supports the finding that the card test is reasonably reliable and accurate, but the evidence shows that the Texas program is essentially the same as that followed throughout the United States, and that such program has been effective in the control and eradication of brucellosis. Points 17 and 18 are, therefore, without merit.

Plaintiff's 20th point asserts that the Texas program violates the requirements of due process because the statutory scheme does not afford plaintiff a hearing on the question of whether or not there is brucellosis in his herd.

There are numerous cases holding that the concept of due process does not necessarily require the granting of a hearing prior to the taking of administrative action in the exercise of the police power. Where a compelling public interest is present, the legislature may constitutionally authorize summary action subject to later judicial review of the validity of such action. This doctrine is the basis for the decision in Conner v. Carlton, 223 So.2d 324 (Fla.1969), upholding the Florida brucellosis control program.

The courts have frequently recognized inspection and testing as valid substitutes for administrative hearings. 1 Davis, Administrative Law Sec. 7.08 (1958). Thus, in North American Cold Storage Co. v. Chicago, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908), the Supreme Court of the United States refused to enjoin the destruction of allegedly putrid meat, although the required factual finding had been made as the result of inspection, without an administrative hearing. The surest way to determine the physical condition of an animal is to examine it and make tests. In cases of this type it must be recognized that the inspection or test is and must be the decisive element. Protection in such cases can be afforded by a right to reinspection or retesting far more than by any right to a formal hearing before an official who must merely listen to testimony. See Final Report, Attorney General's Committee on Administrative Procedure, Sen.Doc.No.8, 77th Congress, 1st Sess. (1941) 37–38.

In the area of health, where administrative orders have as their purpose the elimination of disease or the prevention of its spread, the courts have demonstrated a willingness to dispense with the requirement of a hearing, particularly where the administrative decision is based on test or inspection. Thus, the Oregon court has held that the owner of cows having an infectious disease may be criminally prosecuted for refusing to have them slaughtered, even though the slaughter order was issued without a hearing. State v. Schriber, 185 Or. 615, 205 P.2d 149 (1949). See also Wyant v. Figy, 340 Mich. 602, 66 N.W.2d 240 (1954). Plaintiff's 20th point is overruled.

As already pointed out, the Commission recognizes only the card test, the plate test and the tube test as official tests for the presence of brucellosis in cattle. When blood samples are tested by a laboratory operated by the Commission or the Federal Government, only the card test is used, unless the owner of the herd requests that

one, or both, of the other two official tests be performed. If the governmental laboratory performs all three tests, the present policy of the Commission is to accept the results of the card test as determinative, so that an animal is classified as a reactor if its blood sample produces a positive reaction to the card test, even if the tube and plate test yield a negative reaction.

However, under the Texas program, the owner of a herd may request that the blood samples taken from his cattle be tested by a private laboratory. Since, at the present time, private laboratories do not have access to the materials required to perform the card test, blood samples submitted to a private laboratory are subjected to only the plate test or the tube test. In such cases, the Commission accepts as determinative the results of either the plate test or the tube test.

■ The evidence establishes that of the three official tests the card test is the most sensitive. Plaintiff contends that the present policy of the Commission runs afoul of the constitutional guarantee of equal protection of the laws. His argument is that the practice of allowing private laboratories to make findings based on the two less sensitive tests discriminates against herd owners whose cattle are tested at governmental laboratories where the more sensitive card test is conclusive. If the 17 animals tested in October had been tested at a private laboratory using the plate test, only one of the animals would have been classified as a reactor and condemned to sale for slaughter purposes. If blood samples from those animals have been tested at a private laboratory which used the tube test, only three of the animals would have been marked for slaughter. But because the blood samples from the 17 animals were tested at one of the Commission's laboratories which made the more sensitive card test conclusive, ten of the 17 animals were classified as reactors.

Plaintiff's argument is, on its face, persuasive, but it is not applicable to the case before us. The trial court did not order that any of plaintiff's animals be slaughtered. The judgment below merely orders a retest of plaintiff's herd. Even if only the plate test had been run, it would have shown the presence in plaintiff's herd of one animal infected with brucellosis, and the presence of that one diseased animal would have justified a quarantine of the herd and a subsequent retest. The result would have been the same if plaintiff had submitted the blood samples to a private laboratory. The policy of the Commission, as the case stands before us, has not subjected plaintiff to invidious discrimination. Whether an effort by the Commission to enforce its sale-for-slaughter order of February, 1969, could be successfully challenged on equal protection grounds is a question which is not before us.

■ Plaintiff's final point attacks the brucellosis program because it amounts to a taking of his property without just compensation. His complaint is based on two factors. (1) In order to make his cattle available for the taking of blood samples, he must round up the 438 animals. Not only does this procedure involve a cost of at least $5.00 a head, but it creates a risk of injury to the animals. (2) Forcing an owner to sell reactors for slaughter necessarily results in a loss of at least half the value of cattle which are kept for breeding or dairy purposes, and such forced sale results in a loss to the owner even where the animal branded is a beef animal, since branded animals are usually sold last at auctions, and the bidders know that the owner is not only forced to sell, but that he must do so within a relatively short period and cannot transport the animal out of the county for the purpose of selling him elsewhere.

Though all agree that compensation is constitutionally required only for a governmental "taking" or "damaging" of property, and not for losses resulting from mere

"regulation," the generality of the theory thus formulated makes it of little help in deciding any given case. This area of the law is marked by countless cases which reach apparently incompatible results. Judges have, so far, failed to discover the principle upon which the results can be rationalized. Sax, Takings and the Police Power, 74 Yale L.J. 36 (1964); Dunham, Griggs v. Alleghany County in Perspective: Thirty Years of Supreme Court Expropriation Law, 1962 Sup.Ct.Rev. 63; Kratovil & Harrison, Eminent Domain—Policy and Concept, 42 Calif.L.Rev. 596 (1954); Havran, Eminent Domain and the Police Power, 5 Notre Dame Law 380 (1930).

Plaintiff relies on Neal v. Boog-Scott, 247 S.W. 689 (Tex.Civ.App.—Beaumont 1923, no writ), and its companion case, Neal v. Cain, 247 S.W. 694 (Tex.Civ.App. —Beaumont 1923, no writ). In these cases plaintiff sought, among other things, enforcement of those provisions of the Tick Eradication Law which required the "dipping" of plaintiff's animals. The petition alleged that the dipping solution was very detrimental and "seriously injurious to stock, and that it kills some of the stock and renders others poor and unhealthy; practically ruins the hides of the cattle dipped in such material, and causes the plaintiff's milch cows to go practically dry. * * *" 247 S.W. at 693. The court concluded that, since the statute provided no compensation for the damage suffered by plaintiff, to force plaintiff to use such dip constituted a taking and damaging of their property without just compensation.

The only case cited by the Beaumont court in reaching this conclusion is Castleman v. Rainey, 211 S.W. 630 (Tex.Civ. App.—Dallas 1919, no writ). *Rainey* does not support the holdings in the Neal cases. The court in *Rainey* merely held that the owner of stock was entitled to judgment enjoining state live stock inspectors to compel him, without statutory authority, to dip his animals in a dangerous substance which was not the dip prescribed by the law.

If the Neal decisions compel the conclusion that the Texas brucellosis control program amounts to a taking of private property for public use without payment of just compensation, we decline to follow such holdings. "It is well settled that 'neither a natural person nor a corporation can claim damages on account of being compelled to render obedience to a police regulation designed to secure the common welfare.'. * * *" Chicago, B. & Q. R. Co. v. Chicago, 166 U.S. 226, 250, 17 S.Ct. 581, 591, 41 L.Ed. 979 (1897). The loss suffered by plaintiff here is not of that magnitude which prompted Mr. Justice Holmes to strike down the regulation involved in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), nor is the effect upon plaintiff as severe as the effect of the regulations upheld in United States v. Central Eureka Mining Co., 357 U.S. 155, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958); Champlin Refining Co. v. Corporation Comm'n., 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062 (1932); Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); and Hadacheck v. Sebastian, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915).

It is true that the branding of animals held for breeding or dairy purposes prevents the dedication of such animals to their highest and best use. But similar restrictions on the use to which property may be put, resulting in a diminution in the value of the property affected by the regulation, is consistently held valid in the field of zoning. Euclid Ohio v. Ambler Realty Co., supra. If the brucellosis control program is otherwise valid as an exercise of the police power, the fact that it deprives the property of its most beneficial use does not render it unconstitutional. Goldblatt v. Town of Hempstead, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). For an extreme application of this doctrine see Consolidated Rock Products Co. v. Los Angeles, 57 Cal.2d 515, 20 Cal.Rptr. 638, 370 P.2d 342 (1962), appeal dismissed, 371 U.S. 36, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962), noted in 50 Calif.L.Rev. 896

(1962). See also Hadacheck v. Sebastian, supra.

In Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928), a Virginia statute which required complainant to destroy his trees, without compensation, in order to prevent the spread of a plant disease to nearby orchards was upheld as a valid exercise of the police power. Mr. Justice Stone, pointing out that the injury to complainant was no more serious than in Hadacheck v. Sebastian, supra, said: "And where the public interest is involved preferment of that interest over the property interest of the individual, to the extent even of its destruction, is one of the distinguishing characteristics of every exercise of the police power which affects property." 276 U.S. at 279–280, 48 S.Ct. at 247.

The extent of the loss to plaintiff in this case is not such as to justify the conclusion that the line between the police power and the power of eminent domain has been crossed.

The judgment of the trial court is affirmed.