Lars **JOHANSSON**, President, Pseudorabies Class Action Committee, Plaintiff,

v.

**BOARD OF ANIMAL HEALTH**, Attorney General of Minnesota, Defendants.

Civ. No. 4–84–1089.

United States District Court, D. Minnesota, Fourth Division.

Feb. 8, 1985.

Lars Johansson, pro se.

Hubert Humphrey, III, Atty. Gen., State of Minn., and John K. Murphy, Sp. Asst. Atty. Gen., St. Paul, Minn., for defendants.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on defendants' motion to dismiss for failure to state a claim upon which relief can be granted. The motion to dismiss will be granted.

## FACTS

The plaintiff in this action, Lars Johansson, is a farmer who raises swine. In the title of plaintiff's complaint, plaintiff indicates that he is president of the Pseudorabies Class Action Committee. No motion has been made for class certification under Federal Rule of Civil Procedure 23. The defendants in this case are the Minnesota Board of Animal Health (Board), which is a state agency organized under Minn.Stat. §§ 35.02–.063 (1984), and the Attorney General of Minnesota.

The controversy in this case surrounds the Board's efforts to combat pseudorabies (PRV). PRV is a highly contagious and infectious herpes virus which affects swine. PRV started to regularly appear in Minne-

sota hogs in 1975, and the disease has become an increasingly serious problem. The Board estimates that the economic loss to Minnesota hog producer from PRV currently is approximately $1 million per month. Report of the Hearing Examiner, *In the Matter of the Proposed Adoption of Rules of the State Board of Animal Health Governing the Control of Pseudorabies*, April 6, 1984, at 4–5.

In 1979, the United States Department of Agriculture adopted regulations to prohibit the interstate movement of swine with PRV. 9 C.F.R. §§ 85.1–.13 (1984). The federal rules did not require that states adopt their own quarantine programs, but the movement of a state's swine in interstate commerce would be greatly restricted if a state did not adopt a quarantine program at least as strict as the federal standards. 9 C.F.R. § 85.7 (1984).

Accordingly, the Board established a quarantine program for Minnesota in 1979. *See* Minn.Rules §§ 1705.2060–.2320 (1983). The program required that veterinarians report all cases of PRV to the Board. Once a hog is found to have PRV, the entire herd is quarantined. At this point, the hogs can still be sold for slaughter, but they cannot be sold for breeding. Thus, one method for removing the quarantine was to sell all the hogs for slaughter. Another method for removing the quarantine is for a farmer to remove all the reactors (*i.e.*, hogs who had PRV) from the herd. The farmer then must test the remaining hogs at least 30 days later. If the test indicated that none of the remaining hogs had PRV, then the quarantine was lifted. The farmer had to bear the costs of this testing. *See* Minn.Rules §§ 1705.-2070, .2080, .2100, and .2120 (1983).

In April of 1982, plaintiff's hogs were quarantined, and he allegedly lost approximately $180,000 to $200,000 because of the quarantine.[1] Plaintiff's hogs were intended for breeding, and the quarantine impacts farmers raising breeder hogs much more drastically than farmers raising hogs for slaughter. This disparate impact results, in part, because the price of a breeder hog is higher than the price of a slaughtered hog. Once quarantined, any hog may still be sold for slaughter.[2] Thus, a farmer who has quarantined hogs which were raised for slaughter can still sell them for nearly the same price the farmer originally expected to receive. By contrast, the quarantine forces the farmer to sell breeding hogs for slaughter, which causes the farmer to receive much less income than originally anticipated.

Plaintiff does not allege that he currently has hogs under quarantine, but plaintiff does seek a declaratory judgment invalidating the current rules concerning PRV quarantines. The Board adopted new PRV quarantine rules on July 23, 1984. Minn. Rules §§ 1705.2400–.2530 (Supp.1984). The Board promulgated these rules pursuant to a 1983 Minnesota law requiring the Board to:

> adopt rules to implement a program to control pseudorabies in swine, including pseudorabies testing of breeding swine and restricted movement of feeder pigs.

1983 Minn.Laws ch. 367, § 1, codified at Minn.Stat. § 35.255 (1984). These rules essentially adopted the earlier 1979 rules. One difference, however, is that the new rules require an additional test before the Board will lift the quarantine. After the infected hogs are removed from the herd, a farmer must test the remaining hogs 30 days later and again 30 days after the initial test. Minn.Rules § 1705.2440, subp. 1(B) (Supp.1984).

The current rules also provide that feeder pigs (pigs which will eventually be slaughtered) can be sold to a feed lot which is already quarantined. Minn.Rules § 1705.2430, subp. 3(B) (Supp.1984). Finally, a farmer can obtain the removal of a quarantine if the farmer can establish that

---

1. Plaintiff's complaint does not set out these allegations, but the newspaper articles plaintiff attached to his complaint do contain this information.

2. Humans can safely consume cooked meat from hogs infected with PRV.

the initial diagnosis of PRV was the result of the hogs receiving a PRV vaccination. Minn.Rules § 1705.2440, subp. 2 (Supp. 1984).

After the current rules were adopted, plaintiff went to the Legislative Commission to Review Administrative Rules (LCRAR) to challenge them.[3] LCRAR held hearings on August 2, 1984 and October 10, 1984. The LCRAR refused to suspend the PRV regulations, but it did recommend that the requirement of a second test be abandoned. Defendants state that the Board is proceeding to implement that recommendation.

His efforts in front of the LCRAR proving unsuccessful, plaintiff filed this lawsuit on October 24, 1984. Plaintiff seeks a declaratory judgment against the state of Minnesota, which would hold that the PRV rules are invalid. Plaintiff asserts that the rules are "ineffective, discriminating, and non-protective." Plaintiff also claims that the rules unconstitutionally take private property. In addition to the declaratory relief, plaintiff requests a moratorium on all foreclosures against property owners who are, or have been, subjected to the PRV quarantine. Plaintiff finally seeks redress from the state for all grievances caused by the quarantine, and asks that the Court require the state to establish a claims committee to effectuate that goal.

## DISCUSSION

▮▮▮ Unquestionably, the inherent police power of a state allows a state to establish quarantines to control disease in animals. *See, e.g., Smith v. St. Louis and Southwestern Ry. Co.,* 181 U.S. 248, 255–58, 21 S.Ct. 603, 605–606, 45 L.Ed. 847 (1901). States can even destroy diseased cattle if essential for public safety. *E.g., Lawton v. Steele,* 152 U.S. 133, 136, 14 S.Ct. 499, 500, 38 L.Ed. 385 (1894). The means used by the state, however, cannot go beyond the necessities of the case or unreasonably burden constitutional rights. *Reid v. Colorado,* 187 U.S. 137, 151, 23 S.Ct. 92, 97, 47 L.Ed. 108 (1902).

## Equal Protection

▮▮▮ Plaintiff alleges that the PRV rules are discriminatory, and the Court construes this to be an equal protection argument. Plaintiff makes two major points in this regard. First, plaintiff notes that the economic impact of the PRV rules falls much more heavily on owners of breeder hogs than on owners of hogs raised for slaughter. Defendants do not contest that this disproportionate impact occurs. Yet, defendants argue that the only classification which the PRV rules make is between diseased and healthy swine.

Even though the impact of the PRV rules is disproportionate, the Board's classification (or failure to distinguish between owners of breeder and slaughter hogs) comports with the deferential standard of review courts use in equal protection challenges to state economic regulations. "States are accorded wide latitude in the regulation of their local economies under their police powers ...." *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976) (per curiam). In the area of economic regulation, classifications which have a rational relationship to some legitimate state interest will not be invalidated under the equal protection clause. *E.g., Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 461–62, 101 S.Ct. 715, 722–723, 66 L.Ed.2d 659 (1981); *Dukes,* 427 U.S. at 303, 96 S.Ct. at 2517.

Here, defendants' classification based on whether the hogs are diseased or not, is entirely rationale. Perhaps plaintiff desires that the Board make a further classification between breeder and slaughter hog owners. Such a classification might allow the farmer another method to remove the quarantine, or another outlet for sale of breeder hogs. The Board could rationally conclude, however, that such distinctions to ameliorate the PRV rules' disproportionate impact on breeder hog owners would hin-

---

**3.** LCRAR conducts public hearings on agency rules and it has the power to suspend the enforcement of agency rules. Minn.Stat. § 14.40 (1984).

der the PRV rule's effectiveness in combating the disease.

Another point plaintiff raises which might be classified as an equal protection argument concerns the use of the PRV vaccine to improperly avoid the quarantine. If a PRV test indicates the presence of the disease, a farmer can avoid the quarantine by establishing that the results occurred because the hogs received the PRV vaccine. Minn.Rules § 1705.2440, subp. 2 (Supp.1984). Plaintiff asserts that upon their veterinarians' discovering PRV, many farmers will proceed to vaccinate their herds and will not report the presence of the disease. Apparently, the veterinarians aren't reporting the disease either. If the Board later discovers the presence of PRV in the herd, the farmer can often establish to the satisfaction of the Board that the vaccination caused the positive PRV test results. Thus, plaintiff concludes that the honest farmer is hurt while many dishonest farmers have infected, although undetected, herds.

Plaintiff is no doubt correct that the above described situation, if it exists, is unjust. Nevertheless, the solution to this injustice is not for the Board to relieve honest farmers from complying with quarantine rules simply because dishonest farmers do not comply. Neither is the Board making an irrational classification which denies plaintiff equal protection. True, the Board's rules may solve only a portion of the PRV problem because dishonest farmers circumvent the rules, but states can legitimately adopt regulations which only partially address the problem sought to be combatted. *E.g.*, *Clover Leaf Creamery*, 449 U.S. at 466, 101 S.Ct. at 725; *Williamson v. Lee Optical Co.*, 348 U.S. 483, 488–89, 75 S.Ct. 461, 464–65, 99 L.Ed. 563 (1955).[4]

### Taking

■ Plaintiff's next major argument is that the PRV rules result in a taking of property without just compensation, in violation of the United States Constitution. Presumably, plaintiff's argument is that the taking results from the reduction in value caused by the PRV rules. Defendants, on the other hand, state that the contraction of the disease, and not the PRV rules, is what actually causes plaintiff to lose money.

Defendants also rely on a variety of case law to negate plaintiff's taking claim. In *Miller v. Schoene*, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928), the Supreme Court upheld a state statute which required owners to destroy their infected red cedar trees, but the statute did not provide for compensation of the owners. The goal of the statute was to protect apple orchards from the disease red cedar rust. The Supreme Court reasoned that the state could constitutionally decide to destroy one type of property if it was necessary to save other property which the legislature concluded was more valuable. *Miller*, 276 U.S. at 279, 48 S.Ct. at 247. Here, the Board is not ordering the outright destruction of hogs, but *Miller* indicates that a state could do so without committing a taking.

Defendants further point to a number of state quarantine programs which have withstood constitutional challenges, including allegations of illegal takings. In *Nunley v. Texas Animal Health Commission*, 471 S.W.2d 144 (Tex.Civ.App.1971), for example, the plaintiff challenged Texas' quarantine program to control brucellosis in cattle. The program, like the PRV rules, required that diseased cattle be sold for slaughter. The court acknowledged that the cattle, if healthy and used for breeding, would be worth twice as much as their value for slaughter. *Nunley*, 471 S.W.2d at 147. Nevertheless, the court concluded that the program's reducing the value of cattle by requiring their sale for slaughter did not constitute a taking. *Nunley*, 471 S.W.2d at 150–51. Although not cited by defendants, *Penn Central Transportation*

---

**4.** The LCRAR did recommend that its staff investigate the possible ethical violations by veterinarians who do not report cases of PRV.

*Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) also supports defendants' argument by analogy. In *Penn Central,* the Supreme Court held that a substantial reduction in property value caused by zoning ordinances did not constitute a taking. *Penn Central,* 438 U.S. at 131, 98 S.Ct. at 2662. Similarly, the PRV rule may cause a substantial reduction in value of the diseased hogs, but the hogs still have some value as they can be sold for slaughter.

Another case upholding a state quarantine of brucellosis infected cattle is *Conner v. Carlton,* 223 So.2d 324 (Fla.), *appeal dismissed,* 396 U.S. 272, 90 S.Ct. 481, 24 L.Ed.2d 417 (1969). In *Conner,* the quarantine required the slaughter of diseased cattle and provided for only a minimal compensation ($12.50 per animal) from the state. The court concluded that even where the minimal payment did not completely compensate farmers, no taking had occurred. *Conner,* 223 So.2d at 328. As is evident in *Conner,* quarantine programs which have withstood constitutional challenges often include systems for at least minimal payments to farmers. *See also, Burt v. Arkansas Livestock and Poultry Commission,* 278 Ark. 236, 644 S.W.2d 587 (1983). The Minnesota program for control of tuberculosis, paratuberculosis, and brucellosis also provides set payments to farmers for slaughter cattle. Minn.Stat. § 35.-09 (1984). These payments are reduced by compensation farmers receive from the United States Department of Agriculture. Minn.Stat. § 35.09 (1984).

Apparently, plaintiff's request for a claims committee would entail establishing a system whereby farmers would receive some payments for their slaughtered swine. Such a system might be a salutory measure by the legislature, but the failure to provide such payments does not rise to the level of a constitutional deprivation.[5] The court in *Griffin v. State,* 595 S.W.2d 96, 100 (Tenn.Crim.App.1980) held that the

state may constitutionally require the destruction of diseased animals without compensation as long as the state is not actually appropriating the animals for its own use. The Supreme Court of Iowa has also declared that the payment of compensation to the owner of diseased livestock destroyed by the state is a mere gratuity. *Loftus v. Department of Agriculture of Iowa,* 211 Iowa 566, 232 N.W. 412, 420 (1930), *appeal dismissed for want of a substantial federal question,* 283 U.S. 809, 51 S.Ct. 647, 75 L.Ed. 1427 (1931).

### Substantive Due Process

Plaintiff's final argument is that the quarantine program is ineffective and nonprotective. Defendants argue that such claims do not rise to the level of a federal question and that plaintiff's recourse is under the state statute which allows agency rules to be challenged in state district court. Minn.Stat. § 14.44 (1984). Defendants' position would be correct if plaintiff were arguing only that the quarantine program could be improved. However, plaintiff most likely is arguing not only that the quarantine program could be improved, but also that the program is totally irrational and arbitrary. This latter claim amounts to a substantive due process attack under the fourteenth amendment.

Challenges to economic regulations on the basis of substantive due process are extremely difficult. Just like economic regulations challenged under the equal protection clause, regulations challenged under the due process clause are subject to the very lenient scrutiny of the rational basis test. *E.g., Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 124–25, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91 (1978). In order to be valid, the economic regulation must have only some rational relationship to a legitimate state interest. *Exxon,* 437 U.S. at 124–25, 98 S.Ct. at 2213. The fact that a regulation is not the best possible regulation, or that the regulation leaves much room for improvement are not

---

**5.** Even if the Court were inclined to order defendants to pay damages to farmers, the eleventh amendment and the doctrine of sovereign immunity might make such an order impossible. *See, e.g., Edelman v. Jordan,* 415 U.S. 651, 664, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974).

**1024**

justifications for a court invalidating the regulation. *See Ferguson v. Skrupa,* 372 U.S. 726, 731–32, 83 S.Ct. 1028, 1031–32, 10 L.Ed.2d 93 (1963). Defendants also add that courts should defer to the experience and judgment of administrative agencies "where reasonable minds may differ as to which of several remedial measures should be chosen ...." *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 371–72, 93 S.Ct. 1652, 1661–62, 36 L.Ed.2d 318 (1973).

In sum, plaintiff has pointed out some legitimate concerns concerning the PRV quarantine rules, but none of these concerns rise to the level of a constitutional violation. In the absence of a constitutional violation, the Court cannot sit as a "superlegislature" reviewing the wisdom of legislative and administrative measures. *See Ferguson,* 372 U.S. at 730–31, 83 S.Ct. at 1031. The Court concludes that the PRV rules are rationally related to combatting PRV.

Based on the foregoing, **IT IS ORDERED** that defendants' motion to dismiss for failure to state a claim upon which relief can be granted is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**