MANSFIELD, Justice
(concurring in part and dissenting in part).
I respectfully dissent with respect to Part III of the court’s opinion. I believe the court is taking an overly technical view of the underlying statutory authority provided to the Iowa Department of Natural Resources (DNR).
I do not share the majority’s view that the statute is clear and unambiguous. We read statutes as a whole. See In re Estate of Gantner, 893 N.W.2d 896, 902 (Iowa 2017). Iowa Code section 4840.12(1) (2013) says the DNR “may provide for the quarantine of diseased preserve whitetail that threaten the health of animal populations.” Yet the next subsection, 4840.12(2), states “[t]he landowner, or the landowner’s veterinarian, and an epidemiologist designated by [DNR] shall develop a plan,” which “shall be designed to reduce- and then eliminate the reportable disease, and to prevent the spread of the disease to other animals.” Iowa Code § 484C.12(2). Both subsections need to be read together.
If we read subsection 1 as limiting DNR’s authority strictly to the diseased deer themselves, we cannot account for subsection 2, which gives the DNR broader authority over a “landowner” to implement a plan to “eliminate the reportable disease” and prevent its spread “to other animals.” When we interpret a- statute, we try to harmonize its parts, Iowa Individual Health Benefit Reins. Ass’n v. State Univ. of Iowa, 876 N.W.2d 800, 805 (Iowa 2016). Doing so here, I would conclude that the term “quarantine” gives DNR authority to do what medical science would regard as a reasonable quarantine in response to the outbreak of disease, which may include measures that affect the land as well as the animals.
The majority’s hypertechnieal interpretation of the statute proves too much. Note that the statute says “quarantine of diseased preserve whitetail,” not “quarantine of whitetail that may have been exposed to the disease.” Thus, under the majority’s view, DNR could only take action with respect to deer that currently have the disease, not to other deer on the farm that have been exposed to the disease. That is not all. Under the majority’s view, DNR could not require the landowner to disinfect areas of the farm where the diseased deer have been recently. Furthermore, once the diseased deer have died and their carcasses have been removed, DNR would be without authority altogether. If the majority is right, DNR’s authority would be limited strictly to the sick animals themselves and nothing else.[5]
*552 Although I do not think we need to reach the absurd-results doctrine in light of the ambiguity of section 484C.12 taken as a whole, the majority’s reading of the statute is indeed absurd. If a hospital has authority to “quarantine” a patient, does that mean it can’t keep people out of the patient’s room when the patient is not there? Any infectious disease quarantine has to have some connection to a place where an infected individual has been, not just to that individual.[6]
Furthermore, DNR has issued a regulation that clearly empowers DNR to do what it did. It provides, “A positive test result for chronic wasting disease will result in a minimum of a five-year quarantine on the preserve and all remaining animals located within the infected preserve.” Iowa Admin. Code r. 571-115.10. While Iowa Code section 484C.3 is a general grant of rulemaking authority,[7] rather than a specific grant of interpretive authority, it is fair to characterize “quarantine” as “specialized language” and “a substantive term within the special expertise of the agency.” See Renda v. Iowa Civil Rights Comm’n, 784 N.W.2d 8, 13-14 (Iowa 2010). Hence, I would defer to DNR’s interpretation unless it is “irrational, illogical, or wholly unjustifiable.” Iowa Code § 17A.19(10)(Z). Both sides in this appeal agree that this deferential standard of review is appropriate here.
I do not think it is “irrational, illogical, or wholly unjustifiable” to interpret section 484C.12 as giving DNR authority to require reasonable actions to prevent the spread of the disease based upon where the animals previously were in addition to simply moving the diseased animals themselves.
Additionally, this law operates in a public health area where the State historically has broad authority to act. “Unquestionably, the inherent police power of a state allows a state to establish quarantines to control disease in animals.” Johansson v. Bd. of Animal Health, 601 F.Supp. 1018, 1021 (D. Minn. 1985).
In Shinrone Farms, Inc. v. Gosch, we were asked to interpret an Iowa Code section relating to brucellosis control. See 319 N.W.2d 298 (Iowa 1982). At the time the relevant Code section provided,
Whenever the. balance of [the county brucellosis eradication] fund becomes less than twenty-five hundred dollars, the county auditor shall notify the department [of agriculture] in writing of such fact, and no expense shall be incurred on such account in excess of the cash available in such fund.
Iowa Code § 164.27 (1975). In 1977, the Sac County brucellosis eradication fund lacked sufficient funds to indemnify Shin-rone in full for a brucellosis control claim. Id. at 300. Following the farm’s commencement of litigation, the farm and the county entered into a settlement whereby levies for the benefit of the fund in the maximum amount would continue in future years and the fund would make payments to Shin-rone in future years, until Shinrone’s indemnity claim was paid off. Id. The attorney general, however, issued an opinion that “the county could not commit the fund, for successive years, to payment of the claim.” Id.
*553 We found the settlement was binding and enforceable notwithstanding Iowa Code section 164.27 and other Code provisions. We first observed, “Because chapter 164 is a health regulation within the state’s police power, it is to be liberally construed.” Id. at 302. We then held that section 164.27, “if interpreted to foster the public health objectives of chapter 164, permits the settlement entered into in this case.” Id. at 304. In our view, the section only prohibited current cash payments once the fund balance fell below $2500, not binding agreements to make payments in future years. Id. at 304-05.
Courts must be sensitive to regulatory overreach. Government agencies should not issue a quarantine order that affects a landowner’s livelihood without a legitimate medical and scientific basis for doing so. Although.the parties strongly disagree as to the need for the measures ordered here, the conflicting scientific evidence was presented to the commission, which "upheld DNR’s order. The district court’s order, like today’s opinion, is based solely on DNR’s alleged lack of legal authority due to a crabbed reading of a statute. I’m not qualified to evaluate the science, but on the law I disagree with my colleagues.
For the foregoing reasons, I would reverse the district court’s judicial review order and reinstate the decision of the Natural Resource Commission.
Waterman, J., joins this concurrence in part and dissent in part.

. Under the majority’s view that Iowa Code section 484C.12 only authorizes DNR to isolate the diseased animals and do nothing else, *552 I question whether DNR could even direct the landowner to kill the animals.

. I agree with DNR: "A spatial component is therefore implicit in the definition of quarantine.”

. Iowa Code section 484C.3 provides, "The department shall adopt rules pursuant to chapter 17A as necessary to administer this chapter.”